CITY OF PROVIDENCE *vs.* WALTER J. COMSTOCK *et al.*

APRIL 25, 1906.

PRESENT: Dubois, Blodgett, Johnson, and Parkhurst, JJ.

(1) *Lands Covered by Tide Waters.*

It is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters within the limits of the several States belong to the respective States within which they are found, with

the consequent right to use or dispose of any portion thereof when that can be done without substantial impairment of the interest of the public in the waters.

(2) *State Ownership of Land under Tide Waters.*

In this State the fee of the soil under tide water, within its ordinary ebb and flow, is in the State. The riparian owners were permitted, until the passage of the harbor commissioners' act, so called, to build and maintain wharves and to erect other structures in and over tide water, where they did not interfere with public right of navigation, and maintain and enjoy them against everybody but the State.

(3) *Control over Tide Waters in City of Providence.*

In the city of Providence, however, no such freedom of individual encroachment has ever been allowed. Here the building of wharves and the filling of flats was regulated and controlled by the town government, from the earliest times. While this power to regulate may have been assumed originally by the town, without warrant, from 1707 it was exercised under an express grant of power from the General Assembly then made. From that time the town council exercised full authority to define the lines of the "cove," and to limit the extension of wharves or permanent filling by littoral proprietors and to check encroachments upon the public waters.

July 8, 1782, the town appointed a committee to make a plat of the channel of the river, to determine at what distance on each side of the river into the channel the inhabitants might be permitted to build wharves. This committee reported August 5, 1782, defining the line of the channel, one of the points on the easterly line being the southwest corner of John Smith's wharf, which report was confirmed and the line established by the town, and it was then voted that no person should be permitted to build any wharf or erect any building over the channel to the westward of said line.

June 5, 1797, a committee appointed to ascertain the boundaries of the cove reported a plat entitled "A Platt of that part of the cove above Weybosset Bridge in Providence Town which no one is considered to have an exclusive right, but containeth the Publick moveable waters." This report was adopted; the easterly line of the cove shown upon it was that established by the report of 1782. May 31, 1800, the lines of the plat of 1797 were confirmed, and on May 9, 1814, a committee was appointed to lay out Canal street from Meeting street north to Smith street, forty feet wide. This committee reported August 22nd, 1814, the easterly line of said street being the bounds of the channel as determined by the survey of the town committee made in 1782, also agreeably to the report of the committee for bounding out the public waters of the cove in 1797. The committee, considering the whole of the land over which said street passed as belonging to the public, did not treat with any individuals respecting the same.

August 24, 1814, the town voted that the proprietors of the adjoining lands could fill up so much of the public waters as was described on the plat of said street, provided that they caused to be erected on the westerly line of said street a sufficient wall to the height of the highest water at spring tides. The street was built and accepted January 3, 1825.

October, 1815, the General Assembly again conferred upon the town the

powers it had been exercising under colonial statute, to prevent encroach-
ments or obstructions in the harbor in the cove above the bridge and the
other public waters thereof. The draw of the Weybosset bridge was dis-
continued about 1816, and from that time the waters of the cove ceased
to be actually navigable from the sea. October 28, 1833, the board of
aldermen laid out Canal street from Steeple street northerly fifty feet wide,
taking the additional land on the easterly side of the street as formerly
laid out, but awarding no damages to the owners of the abutting estates,
most of them having petitioned for the layout and waived damages.
Among those who agreed that the layout of the street caused them no
damage were defendant's ancestors in title.

October 27, 1841, the General Assembly passed an act forbidding any person
to erect any wharf or building upon any part of the cove or other public
waters above Weybosset bridge outside of the then high-water mark, with-
out permission first granted by the board of aldermen of the city of Provi-
dence. In 1823 the Blackstone Canal Company, under its charter, took
possession of the lower part of the Moshassuck river and the easterly side
of the cove, at the place in dispute, and used it as a basin for its boats until
1849, when the canal was abandoned and the *locus in quo* reverted to its
former owners.

In May, 1845, the city council of the city of Providence was authorized by
the General Assembly to grant to any railroad company whose railroad
terminated in the city the right and privilege of establishing a depot upon
any part of the land covered by the public waters above Weybosset bridge,
provided, that it should not be construed to impair the rights which belonged
to the State in that part of the land covered by the public waters which the
city did not appropriate to the use of the railroad. In accordance with
this and later acts the railroads located their roads and depots on the filled
land occupying a portion of the cove and extended a retaining wall south-
erly from Smith street so as to form the westerly bank of the Moshassuck
river, and also erected permanent bridges over the river above Weybosset
bridge. No claim was made at this time by any of the owners of private
property that they possessed riparian or littoral rights which were then
extinguished. The wall forming the easterly boundary of the land in dis-
pute was erected about the time of the location of the railroads upon the
cove lands. May 21, 1855, the common council requested the board of
aldermen to cause the wall on the westerly side of Canal street to be re-
moved so as to be on a line drawn from the wall at the turn of the river at
the foot of Meeting street to a point 10 feet west of the east abutment of
Shingle bridge, so-called, and fill up the land and make the street conform
to the same. This work was accordingly done.

The plaintiff's ancestors in title in 1815 were owners of a lot of land extending
from Main street on the east to the cove, bounded on the north by Hay-
market street, and on the south by Meeting street, and probably partici-
pated in the work of filling out the street. This grant, however, gave no
private rights in the land reclaimed. The work which the proprietors did
was only their contribution towards the construction of the street upon
land owned by the State, which was a special benefit to their estates.

In 1867 the General Assembly passed a resolution revoking all grants of any

portion of the cove lands which had not been accepted and the conditions of which had not been complied with, and in 1870 instructed the general treasurer to execute a deed of the cove lands to the city of Providence, which was done May 14, 1870, in consideration of the sum of $200,000. This court has repeatedly held that by this deed the State conveyed to the city the lands described therein in fee simple. The land in dispute in this case is, and in 1870 was, flowed by tide water, and is a portion of the lands described in said deed.

In April, 1880, the lessor of defendants gave notice to the city engineer, as required by chapter 688, section 8, of the Public Laws, passed April 12, 1878, that he intended to erect a building to be located on the westerly side of Canal street, between Haymarket and Meeting streets, on the estate owned by Moses B. Jenkins; the city engineer did not reply to this notice, and lessor did not erect the building. In May, 1882, the defendants began the erection of the building now occupied by them, which from its completion the assessors of taxes have levied a tax upon:—

*Held*, that riparian rights do not attach to lands, however near, which do not extend to the water, nor do they necessarily attach to a State grant of lands lying below the tidal high-water mark. Neither the defendants nor their lessor had anything to do with the filling of the land in 1855, and that before this occupation began and before the land existed as made land, all private littoral rights in the waters of the cove had been extinguished. The defendant's lessor and his predecessors as owners of the land on the original easterly shore of the cove never had the right of building wharves or reclaiming land for themselves beyond the southwest corner of John Smith's wharf and the easterly line of the channel established in 1782; they had at the most the right of access to the waters of the cove, thence by the natural channel to the sea. When this access was cut off, their only littoral right was extinguished.

*Held*, further, that the notice given by the lessor of defendant was of no avail, as nothing was done under it. There was no intimation that he intended to extend his building over the water.

*Held*, further, that the taxing of the building of defendants could not be construed as permission to them to locate it upon plaintiff's land. The assessors of taxes are not empowered to make admissions of title on behalf of the city.

*Held*, further, that the objection to the form of proceedings was untenable. The owner was ousted from possession by defendant, and the action of trespass and ejectment was the proper action to establish title and recover possesssion. The fact that water flowed over the land did not forbid the action.

TRESPASS AND EJECTMENT. Heard on petition of defendants for new trial and denied.

PER CURIAM. A careful consideration of the questions raised by the defendants' exceptions shows no error on the part of the learned justice before whom the case was tried

without a jury before the passage of the court and practice act, and his decision is adopted as the opinion of this court.

Defendants' petition for new trial denied and case remitted to the Superior Court with direction to enter judgment for the plaintiff for possession and costs.

## DECISION.

DOUGLAS, J.   This is an action of trespass and ejectment, brought April 3, 1899, to recover possession of land, covered by tide water, now occupied by the defendants by a warehouse supported on piles driven into the ground.

The land lies in the bed of the Moshassuck river, which at this place is confined between retaining walls.   It was once part of the bed of the cove far below high-water mark.   Since the first settlement of Providence the shores of the cove have been extended into the water from time to time, until the whole cove, except the artificial channels left for the Woonasquatucket and Moshassuck rivers, has become dry land.   In the channels of these rivers the tide still ebbs and flows.

The plaintiff claims this land by deed of the State of Rhode Island dated May 14, 1870, conveying to the plaintiff in fee simple the cove lands then or theretofore covered by tide water above Weybosset bridge, of which the State then retained the ownership.

The defendants hold a lease of this same land and a strip of filled land from ten to fifteen feet wide on the easterly bank of the river as it flows at the present time, extending easterly to the westerly line of Canal street as it was laid out in 1833.

The lessors and their predecessors in title were owners of a lot of land bounded easterly on North Main street and extending to the waters of the cove, as the shore originally ran. The north and south lines of this lot extended westerly embrace the strip of filled land claimed by the defendants and the land in the bed of the river now in dispute.

The defendants claim, *First*, that their lessors by reason of their ownership of the original shore acquired title to the filled land, and that appurtenant to the strip of filled land are

certain riparian rights which entitle them to occupy the bed of the river as they now do, nothwithstanding the conveyance of the same in fee to the plaintiff.

*Secondly.* That the plaintiff, having tacitly permitted them to build, is estopped to deny their right.

*Thirdly.* That the action of trespass and ejectment will not lie in the premises, the only remedy for encroachment upon land flowed by tide water in the nature of a purpresture being by indictment or information.

The title to the strip of filled land is not put in issue by the pleadings in this case, and for the purposes of this decision it may be assumed that it is in the defendants' lessor.

Waiving also the fact that the building maintained by the defendants is a warehouse with no opening upon the river, a structure adapted and used exclusively for purposes unconnected with navigation and commerce, I think the defendants are in error in their notion that the State was not competent to give a clear title to the plaintiff free of all servitudes or rights in the nature of public trusts, as well as in assuming that there are, or ever were, any littoral rights whatsoever appertaining to the filled land bordering on the present river.

The late case of *Murphy* v. *Bullock*, 20 R. I. 35, may be considered as practically settling the claims of riparian rights made by these defendants, but it may not be uninstructive to examine more specifically these claims in the light of the legislation which has been had with respect to the cove lands and its application to the views now urged upon the court.

There can be no doubt at this day of the relation which the State holds to tide-flowed lands at common law. Mr. Justice Field, speaking for a majority of the Supreme Court of the United States, in *Ill. Cent. R. R.* v. *Illinois*, 146 U. S. 387, 435, says:

"It is the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters, within the limits of the several States, belong to the respective States within which they are found, with the consequent right to use or dispose of any portion thereof when that can be done without substantial impairment of the interest of

the public in the waters and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among States."

The court insists on a limitation of the power of the State to convey these lands growing out of its paramount obligation to preserve to the public the rights of navigation, but admits that the State may convey parcels of tide-flowed lands to individuals for the promotion of navigation or "when parcels can be disposed of without detriment to the public interest in the lands and waters remaining," pp. 455, 456.    The dissenting opinion in the same case, written by Mr. Justice Shiras and concurred in by Mr. Justice Gray and Mr. Justice Brown, goes farther.    It begins, p. 465: "That the ownership of a State in the lands underlying its navigable waters is as complete, and its power to make them the subject of conveyance and grant is as full as such ownership and power to grant in the case of the other public lands of the State, I have supposed to be well settled," and supports this proposition by quotation from *Weber* v. *Harbor Commissioners*, 18 Wall. 57, 65; *Hoboken* v. *Penn. R. R.*, 124 U. S. 656, 657; *Stevens* v. *Paterson & Newark R. R.*; 34 N. J. L. 532; *Langdon* v. *N. Y. City*, 93 N. Y. 129, 155.

"By the law of England every building or wharf erected without license below high-water mark, where the soil is the king's, is a purpresture and may at suit of the king either be demolished, or be seized and rented for his benefit if it is not a nuisance to navigation."    *Shively* v. *Bowlby*, 152 U. S. 1, 13. See also *Esenbach* v. *Hatfield*, 2 Wash. St. 236, 249.

And the common law in this regard is in force in this country except as it has been changed by local legislation or custom.

There is a general impression, arising from some remarks by Angell in his Treatise on Tide Waters, 2nd ed. 1847, that the power of this State over tide-flowed lands is less than was originally given it by the common law, in that in Rhode Island a littoral proprietor has the natural right to extend his wharves and to fill flats into the salt water until he is stopped by the demands of navigation.

Mr. Angell says, p. 236:    "In Rhode Island an opinion has

long prevailed throughout the portion of the State contiguous to tide water, that the proprietor of an estate adjoining the salt water might lawfully augment it, by embanking in and upon the water, so long as he did not encroach upon nor obstruct what is generally denominated the channel, or in other words, so long as he did no injury whatever to the public. Hence it is that the custom has been general to make accessions of land in this manner without any suspicion of the want of right and authority so to do and consequently without obtaining any formal and express sanction of the sovereign or legislative power." But Mr. Angell immediately proceeds to quote a colonial statute of May, 1707, found in R. I. Col. Rec. vol. 4, p. 24 (printed since he wrote), which gave to the several towns the right to license such wharves and extensions of the shore in their respective borders, and very well accounts for the absence of applications to the General Assembly for such permission. This court has, however, affirmed the view taken by Angell and confirmed the privilege of the littoral proprietor to fill out flats or build wharves until forbidden by the State. *Prov. Steam Engine Co.* v. *Prov. S. S. Co.,* 12 R. I. 348; *Clark* v. *Peckham,* 10 R. I. 35. It is said in *Folsom* v. *Freeborn,* 13 R. I. 200, 204: "In this State as we have often decided, the fee of the soil under tide water and within its ordinary ebb and flow is in the state. The riparian owners are or at least were until the recent statute—Pub. Laws cap. 611, § 5, of March 30, 1877—permitted to build and maintain wharves in front of their land provided they are so built as not to impede navigation. They may also erect other structures in or over tide water in front of their lands where they do not interfere with the public right of navigation and maintain and enjoy them against everybody but the State."

The statute referred to is the harbor commissioners' act, which interdicted further erections or encroachments in the tide waters of the State except such as should be authorized by the harbor commissioners or by the General Assembly.

The custom, as stated by Angell, may have been prevalent in his time throughout a large part of the State, and the inference of tacit permission may have been justified as applicable

to the sea-shore generally, but no such freedom of individual encroachment seems ever to have been allowed in the town of Providence. Here the building of wharves and the filling of flats was regulated and controlled by the town government from the earliest times.

A perusal of the earliest records of the town of Providence (now accessible in print) shows many grants by the town to petitioning inhabitants of parcels of forty feet square above high-water mark, with the privilege of a wharf. Fourteen such grants appear from January 27, 1679, to July 17, 1682 and one May 19, 1707.

Early records of Providence, vols. VII, XI, and XV.

(3)    In Providence, at least, the riparian owners did not assume the right to build wharves without permission of the authorities. The power to regulate the building of wharves may have been assumed originally by the town without warrant, but it was apparently acquiesced in by the State, and from 1707, as we have seen, it was exercised under the express grant of power from the General Assembly which was then made.

From that time on the town council exercised full authority to define the lines of the cove, and to limit the extension of wharves or permanent filling by littoral proprietors, and to check encroachments upon the public waters.

Certain votes of the town on this subject are particularly pertinent as relating to the original shore lot of the plaintiff's lessors, upon which was a wharf built or owned by John Smith. August 12, 1774, it was voted that John Smith have "liberty to extend his warfe 40 feet further than were the head of his warfe now is." T. M. 6–18.

July 8, 1782. "For preventing contests and disputes hereafter, It is voted and resolved that Nicholas Brown, Ambrose Page, Zephaniah Andrews, Welcome Arnold and the Hon. Nicholas Cooke, Esq., be and they are hereby appointed a committee to make a plat of the channel of the river from the Mill Bridge to opposite Messrs. Clarke and Nightingale's lower wharf and to determine at what distance on each side of the river into the channel the inhabitants may be permitted to build wharves, set stone, &c." T. M. 6–157.

This committee reported, August 5, 1782, as follows:

"Agreeable to the directions of the last Town Meeting we have surveyed the Channel from the Mill Bridge to Weybosset Bridge, and it is our opinion that the line on the east side of the channel ought to run as follows:" Then follows the line, one of the points of which is "the South West corner of Mr. John Smith's Wharf."

The town took action on this report, as follows: "And the said report having been twice read and duly considered it is voted and resolved that the same be received and that the line therein mentioned be established as the eastern boundary of the channel so far as the said report extends, and it is voted and resolved that no person shall be permitted to build any wharff or erect any building over the said channel to the westward of said line under the penalty of being indicted as for committing a common nuisance, and that the town clerk be appointed to inform Captain Benjamin Stelle of this vote and that it is the particular request of this meeting that he will conform the boundaries of his wharff and lot agreeable to the said report by removing such part thereof as is to the westward of said line." T. M. 6–157.

June 5, 1797, a committee appointed to ascertain the boundaries of the cove reported a plat made by Daniel Anthony, which plat is entitled: "A platt of that part of the cove above Weybosset Bridge in Providence Town which no one is considered to have an exclusive right but containeth the Publick moveable waters." This report was adopted. Town Meeting Book 7–399. The easterly line of the cove shown upon it is the line established by the report of 1782.

May 31, 1800, the lines of the plat of 1797 were confirmed. May 9, 1814, a committee was appointed to lay out what is now Canal street from Meeting street north to Smith street, forty feet wide. This committee reported August 22, 1814, the easterly lines of said street being "the bounds of the channel as determined by the survey of the town committee as per their report made in the year 1782 and also agreeably to the report of the committee for bounding out the public waters of the Cove made in the year 1797, we considering the

whole of the land over which the said street passes as belonging to the public, have not treated with any individuals respecting the same." T. C. 9 B. 74. August 22, 1814, the town council voted that said layout should be referred to the town meeting because the street would "not run through land of individuals but entirely through the public waters and without the line which the town by vote August 5, 1782, ordered should not be violated." T. C. B. 9–74.

August 24, 1814, the town voted that the proprietors of adjoining lands could "fill up so much of the public waters as is described on the plat returned with the committee's report for said intended street provided they cause to be erected on the westerly line of said street a sufficient wall to the height of the highest water at spring tides," &c., also that they cause Smith's Bridge to be removed to the westward so far as to allow a watercourse of forty feet to the westward of said street, and the town to allow $1,000 on the completion of the work. May, 1815, the General Assembly granted a lottery to raise $4,000 of the money required to build this street. The street was finally completed and accepted January 3, 1825. T. C. 11–299.

The plaintiff's ancestors in title were owners at this time of the lot of land extending from Main street on the east to the cove, bounded on the north by Haymarket street and on the south by Meeting street, and probably participated in this work of filling out. This grant, however, gave no private rights in the land reclaimed. The work which the proprietors did was only their contribution towards the construction of a street, upon land owned by the State, which was a special benefit to their estates. Such a grant is always to be construed most strictly. Says Mr. Justice Gray in *Shively* v. *Bowlby, supra,* p. 10: "It was argued for the defendants in error that the question presented was a mere question of the construction of a grant bounded by tide water and would have been the same as it is if the grantor had been a private person. But this is not so. The rule of construction in the case of such a grant from the sovereign is quite different from that which governs private grants. The familiar rule and its

chief foundation were felicitously expressed by Sir William Scott, 'all grants of the Crown are to be strictly construed against the grantee contrary to the usual policy of the law in the consideration of grants; and upon this just ground that the prerogatives and rights and emoluments of the Crown being conferred upon it for great purposes, and for the public use, it shall not be intended that such prerogatives, rights and emoluments are diminished by any grant beyond what such grant by necessary and unavoidable construction shall take away.' The Rebeckah, 1 C. Rob. 227, 230."

Riparian rights do not attach to any lands, however near, which do not extend to the water. Nor do they necessarily attach to a State grant of lands lying below the tidal high-water mark. Gould on Waters, 302; *Turner* v. *Peoples Ferry Co.*, 21 Fed. Rep. 90; *Hoboken* v. *Penn. R. R. Co.*, 16 Fed. Rep. 816.

In *Morris* v. *United States*, 174 U. S. 271, one set of claimants were owners of lots separated from the river by a street and filled land. It was held that they had no riparian rights unless by special grant, as the intention of the government which laid out the street was to retain the ownership of it.

At the October session, 1815, after the State had become independent of Great Britain, the General Assembly again conferred upon the town the restrictive powers it had been exercising under the colonial statute, passed in the reign of Queen Anne, which, not having been printed in the compilation of the laws, may have been forgotten. The first section of the act is as follows: "Section 1. Be it enacted by the General Assembly and by the authority thereof it is enacted, That the Town of Providence be and the said town hereby is authorized and empowered to prevent encroachments or obstructions in the harbor of said town in the cove above the bridge and in the other public waters thereof; and to make such laws, rules and regulations for the preservation of said harbor, cove and waters from encroachments and obstructions as said town shall think proper from time to time to make and enact."

Section 3 provides a penalty to be recovered from any

person who shall encroach upon the harbor by placing therein any "wharf, building or other fixed obstruction," &c.

Charter and Spec. Laws, 1901, p. 212.   Digest 1822, p. 484.

As nearly as the plaintiff's witnesses have been able to ascertain, the draw in the Weybosset bridge was discontinued about 1816, and from that time the waters of the cove ceased to be actually navigable from the sea.

Thenceforward the public right of commercial navigation has ceased, and the private riparian right of mere access to the salt water, if any still existed, became of no appreciable value. Such contact was no longer access to the highway of nations.

The growth of the city upon the west side of the river made a permanent bridge so manifestly a necessity, though it should be maintained only by the sacrifice of these rights in the waters above, that no protest seems to have been made and it seems that even the exact date of the change can not now be determined. *Rex* v. *Montague,* 4 B. & C. 603; *Commonwealth* v. *Wright,* 3 Amer. Jurist 185, quoted in Angell on Tide Water, 207.

Various steps were taken to preserve the cove as a feature of the landscape and for supposed sanitary or hydraulic reasons from that time until it was finally filled in 1892, but no legislation for nearly a hundred years has recognized any riparian or littoral rights in the owners of the lands bordering on the original lines of the salt water.   Streets were laid out around it for the express purpose of excluding such claims by cutting off the access of those proprietors to the channel, and in all such layouts it was agreed that no damage was done to private owners.

October 28, 1833, the board of aldermen laid out Canal street from Steeple street northerly, fifty feet wide, taking the additional land on the easterly side of the street as formerly laid out, but awarding no damages to the owners of the abutting estates, most of them having petitioned for the layout and waived damages. Street Book 1, 339. Among those who agreed that the layout of this street caused them no damage were William and Anna Jenkins, the defendants' ancestors in title.

The last enactment of the General Assembly before the constitution of the State went into effect, which related to this subject, was passed October 27th, 1841, and is entitled "An act in addition to an act relative to the harbor and public waters of the town of Providence.

"Be it enacted by the General Assembly as follows: Section 1. If any person shall erect or build or cause to be erected or built any wharf or buildings upon any part of the cove or other public waters above Weybosset bridge in the city of Providence outside of the present high-water mark, or shall place or cause to be placed in said cove or other public waters any other obstruction of any kind whatsoever, without permission first granted by the board of aldermen of said city, the person or persons so offending shall forfeit and pay a sum of money," &c.

In 1823 the Blackstone Canal Company was incorporated and under its charter took possession of the lower part of the Moshassuck river and the easterly side of the cove at the place now in dispute, and used it as a basin for its boats until 1849, when the canal was abandoned and the *locus in quo* reverted to its former owners. In the meanwhile, in 1844, the Providence & Worcester Railroad Company was incorporated, and in May, 1845, the city council of the city of Providence were authorized, by act of the General Assembly, "to grant upon such terms and conditions as they may deem for the public good to any railroad company whose railroad terminates in the city, the right and privilege of establishing a depot upon any part of the land covered by the public waters in said city above Weybosset Bridge," &c., but providing also that "nothing in this act shall be construed to surrender or impair any rights which belong to the state in that part of said land covered by the public waters which said city does not appropriate to the use of said railroad company."

In accordance with this and later acts, and the grants made by the city council under them, the railroads terminating in the city located their roads and depots on the filled land occupying a portion of the cove and incidentally extended a retaining wall southerly from Smith street so as to form the

westerly bank of the Moshassuck river where the Canal basin had formerly been. They also erected and maintained permanent bridges over the river above Weybosset bridge and dams at various points, effectually and permanently shutting off all actual access from these waters by boat to the sea. In every one of these enabling acts were provisions that no private property should be taken without compensation, and means were provided in the charters of the railroads for securing compensation; yet no claim was made by any of these owners that they possessed riparian or littoral rights which were thus extinguished.

The wall which forms the eastern boundary of the land in dispute was erected about the time of the location of the railroads upon the cove lands, or within a few years thereafter. On the map filed by the defendants, made by W. S. Haines in 1872, it is noted that part of this wall was probably built by the Providence & Worcester Railroad Company before June, 1847, and the remainder between June, 1847, and September, 1848, and the space between this wall and the wall forming the westerly line of Canal street, as laid out in 1833, was filled in by the same company at that time.

May 21, 1855, the common council requested the board of aldermen "to cause the wall on the west side of Canal street to be removed so as to be on a line drawn from the wall at the turn of the river, at the foot of Meeting street, to a point ten feet west of the east abutment of Shingle bridge (so-called), and to fill up the land and make the street to conform to the same." C. C. Rec. 3–501. May 30, 1855, the board of aldermen ordered the work done according to the preceding resolution. B. A. Rec. 3–322. It appears probable, therefore, that Mr. Haines is in error, and that the wall was built and the filling made by the city.

In either case, neither the defendants nor their lessor had anything to do with the filling of this land, and it is clear that, before this occupation began and before the land existed as made land, all private *littoral rights* in the waters of the cove, such as the defendants now claim, had been extinguished.

The defendants' lessor and his predecessors, as owners of

the land on the original easterly shore of the cove, never had the rights of building wharves or reclaiming land for themselves beyond the southwest corner of Mr. John Smith's wharf and the easterly line of the channel established in 1782. They had at the most the right of access to the water of the cove and thence by the natural channel to the sea. When this access was cut off by the public in the interests of a growing community, their only littoral right was extinguished, and they made no claim that they were thereby damaged. As was said in Clark v. City of Providence, 16 R. I. 338, in speaking of a similar claim relating to land on the south of the cove: "The lot as now used by Sabin does not extend to the cove basin, but between it and the basin there is a wide space used partly as a public square or street, partly as a railway depot, and partly also as a portion of the park or promenade surrounding the basin. The portion of this land nearest to said basin, including said park, was filled out by the Providence & Worcester Railroad Company, under the authority of a special act of the General Assembly which reserved to the State all its rights to the land so filled which should not be appropriated to the railroad company. Under this reservation the title to at least the rim of land around the cove basin remained in the State after it was filled, said land never having been appropriated to the railroad company, and the owner of the Sabin lot ceased to be a riparian proprietor. The riparian rights appurtenant to the lots, if they had not previously been extinguished, were then taken away, and the owner, if entitled to compensation for them, should have claimed it then."

With respect to the claim of riparian rights as appurtenant to the strip of filled land now bordering on the water, the case of Weber v. Harbor Commissioners, 18 Wall. 57, is very much in point. The plaintiff claimed riparian rights as appurtenant to filled land in the Bay of San Francisco to which he had acquired title. Before this land had been reclaimed a permanent water front or harbor line had been established, beyond which encroachments were forbidden, the space beyond being reserved in the control of the city.

Mr. Justice Field says, p. 65: "The complainant is not the

proprietor of any land bordering on the shore of the sea in any proper sense of that term.   His land is situated nearly one-half a mile from what was the shore of the Bay of San Francisco at the time California was admitted into the Union, and over it the water at the lowest tide flowed at a depth sufficient to float vessels of ordinary size;" and after reciting the legislation, proceeds, p. 67: "It was after the passage of these acts that the predecessors of the complainant acquired all the title to the lots which he holds; and they took whatever interest they obtained in subordination to the control by the city over the space immediately beyond the line of the water front, and the right of the State to regulate the construction of wharves and other improvements.  There is therefore no just foundation for the claim by the complainant as riparian proprietor of a right to wharf out into the bay in front of his land.   He holds as his predecessors took the premises freed from any such appendant right.   The erection of his wharf, the obstruction to the use of which is the cause of the present suit, was therefore not only an interference with the rightful control of the city over the space occupied by it, but was an encroachment upon the soil of the State which she could remove at pleasure," &c.

The subsequent legislation relating to the cove was in line with that already cited and permitted no new littoral rights to arise, excepting only a grant of title to certain thatch rights, January, 1861, which does not affect this case.   At the January session, 1867, the General Assembly passed a resolution revoking all grants of any portion of the cove lands which had not been accepted and the conditions of which had not been complied with, and at the January session, 1870, instructed the general treasurer to execute a deed of the cove lands to the city of Providence.   May 14, 1870, such a deed was executed and delivered, in consideration of the sum of two hundred thousand dollars.

This court has repeatedly held that by this deed the State conveyed to the city the lands described therein in fee-simple. *Murphy* v. *Bullock*, 20 R. I. 35; *Clark* v. *Providence*, 16 R. I. 337.

The land in dispute in this case is and in 1870 was flowed

by tide water, and is a portion of the lands described in said deed. I find that this title in fee-simple is not modified or restricted by any littoral or other rights appertaining to the land leased to the defendants on the east bank of the present channel of the Moshassuck river, or to the land of said lessors on the east side of Canal street.

The facts upon which the defendants rely as a foundation for their claim of estoppel are that their lessor, in April, 1880, gave notice to the city engineer, as required by section 8 of chapter 688 of the Public Laws passed April 12, 1878, that he intended to erect a building "to be located on W. side Canal St. bet. Meeting and Haymarket Sts. on estate owned by Moses B. Jenkins."

The city engineer did not reply to this notice, and the lessor did not erect the building.

Two years afterwards, in May, 1882, the defendants began the erection of the building now occupied by them. From the time of the completion of the building the assessors of taxes have levied a tax upon it, appraising it at $4,000 in 1882, and in subsequent years at $5,500.

I can not see that the notice given by the lessor is of any avail in this connection, for nothing was done under it. There is no intimation in the notice that he intended to extend his building over the water. Neither does it seem to me that taxing the building of the defendants can be construed as permission to them to locate it upon the plaintiff's land. The tax assessors saw the building *in situ*, ascertained who the owners of it were, appraised it at a value which they considered just, and assessed the tax upon the owners.

The assessors of taxes are not empowered to make admissions of title on behalf of the city. Their acts are only binding on the city in the scope of their official employment. See *Reuter* v. *Lawe*, 94 Wis. 300, and cases cited, 304.

Many cases are cited by the defendants to illustrate the doctrine that a court will in a proper case hold a municipal corporation estopped to set up title to land. None of them are closely analogous to the case at bar. The nearest, perhaps, are *Simplot* v. *Dubuque*, 49 Ia. 630, and the cases in Iowa fol-

lowing that decision. In that case, however, the court which had held the city estopped by its acts in the premises say, on petition for rehearing, p. 634: "The acts of the city council conclusively show an abandonment of any right to the land. They do not appear to be unauthorized acts of certain officers of the city, but to be the acts of the city council." The case is referred to with disapproval in *Reuter* v. *Lawe,* 94 Wis. 300, which holds that "the conduct of a municipal corporation may be such that a change of its position will cause such injustice to those who have relied upon such conduct as to warrant the court in preventing such change by an application of the doctrine of equitable estoppel *in pais;*" and continues, 305: "That the equitable rule is applied as freely against the public as against private persons is not maintained, but that the court may administer justice by its aid, even where that results in controlling the conduct of municipal corporations when the facts are such, in the judgment of the court, as to demand it to prevent manifest injustice and wrong to private persons, is firmly established." In this case the city had required the claimant to build a sidewalk and had taxed the property as his for many years, and other facts concurred to persuade the court to apply the doctrine of estoppel in the interests of justice.

Herman on Estoppel repudiates the doctrine that a municipal corporation, merely by taxing land as private property and taking no steps to eject the claimant, is estopped to claim title for itself. The author says, p. 1364: "This application of the doctrine is denied and a municipality is held not to be estopped to claim title to the land because its officers without authority have assessed the same to private individuals and returned it as delinquent and sold it at a tax sale. The ground of this latter rule is that the acts of its officers are unauthorized and void, and that a purchaser at a tax sale is bound to take notice of the extent of their powers. If this were not the correct rule, unscrupulous officials might deprive a county or city of all its property and there would be no redress." To the same effect are 2 Dill. on Mun. Corp. 659, n., and *St. Louis* v. *Gorman,* 29 Mo. 593, 599, 600; *Rossire* v. *Boston,* 4 Allen, 57;

*McFarlan* v. *Kerr*, 10 Bosw. (N. Y.) 249; *Ellsworth* v. *Grand Rapids*, 27 Mich. 250; *Rhodes* v. *Brightwood*, 43 N. E. Rep. 942, 945.

In the case at bar there is no evidence that the defendants were in any manner induced to erect their building by acts of the city. They knew that the statutes and ordinances in force forbade their action and that the city denied their title.

If one builds a house on the land of another, not by reason of the fact that the latter has knowledge he is doing so and permits him to spend his money, but because of the fact that he, relying on his own judgment, believes he has title—then no estoppel is created against the owner. *County of Buena Vista* v. *Iowa F. &. S. C. R. Co.*, 46 Ia. 226, 228.

In the present case, if the city had taxed the land as belonging to defendants, and they had then built upon it, the case would have come nearer to some of those cited by the defendants and the question of estoppel might be a debatable one. On the facts as they appear, I see no merit in this ground of defence.

The objection to the form of proceeding seems to me untenable. The erection maintained by the defendants might be considered a purpresture if the land still belonged to the State. As such it might be redressed by suitable remedies of a *quasi* criminal character, as by writ *ad quod damnum*, or by information. But the land is now owned by a municipal corporation in its *demesne* as of fee. The owner has been ousted from possession by the defendants, and the action of trespass and ejectment is the appropriate action to establish title and recover possession. We have no other form of action by which private property in land may be determined. The fact that water flows over the land does not forbid this action.

That ejectment is the proper form of action by which either a State or a private owner or lessee deriving title from the State may recover possession of land covered by tide water is held in *Martin* v. *Waddell*, 16 Pet. 367, 407, 408, 419; *Den* v. *Jersey Co.*, 15 How. 426; and approved in *Shively* v. *Bowlby*, 152 U. S. 1, 14; *Lowndes* v. *Huntington*, 153 U. S. 1, 18, 30; *Morris* v. *United States*, 174 U. S. 196, 230. And with these cases all the authorities agree. Sedgw. & Wait on Trial of

Title to Land, 63; Newell on Ejectment, 54, 30; Tyler on Ejectment, &c., 43; 7 Ency. Pl. & Pr. 272; *Hinman* v. *Warren,* 6 Ore. 408; *Coburn* v. *Ames,* 52 Cal. 385, 397–8; *People* v. *Davidson,* 30 Cal. 379, 389; *Nichols* v. *Lewis,* 15 Conn. 137, 143, 144; *Browne* v. *Kennedy,* 5 Harr. & J. (Md.) 195.

Decision for the plaintiff for possession and costs.

*Francis Colwell & Albert A. Baker* for plaintiff.

*James Tillinghast, Wm. R. Tillinghast, Dexter B. Potter & Edward T. Carr* for defendants.