The GREATER PROVIDENCE
CHAMBER OF COMMERCE
et al.

v.

STATE of Rhode Island.

No. 94–153–Appeal.

Supreme Court of Rhode Island.

April 24, 1995.

John Boehnert, Partridge, Snow & Hahn, Providence, for plaintiffs.

Michael L. Rubin, Asst. Atty. Gen., Lauren S. Zurier, Sp. Asst. Atty. Gen., Richard B. Sheffield, G. Quentin Anthony, Newport, Jeanne Shepard, Goldman & Biafore, Providence, Kendra Beaver (DEM), for defendant.

Dennis W. Nixon, Kingston, Robert Kehoe, David C. Slade, Washington, DC, Elizabeth R. Thagard, Boston, MA, S. Paul Ryan, East Providence, Richard Emmet, Boston, MA, for amicus curiae.

## OPINION

SHEA, Justice.

This action brought in the Superior Court for Providence County seeks a declaratory judgment regarding the effect of the "Public Trust Doctrine" on certain interests that each plaintiff has in certain real property.[1] The plaintiffs, who are the Greater Providence Chamber of Commerce (Chamber of Commerce), Rhode Island School of Design (RISD), Narragansett Electric Company (electric company), and Providence Gas Company (gas company), and the defendant State of Rhode Island (state) filed a joint petition and an agreed statement of facts seeking the declaratory judgment. Pursuant to G.L.1956 (1985 Reenactment) § 9–24–25, this declaratory-judgment action with the agreed statement of facts has been certified to the Supreme Court for determination.

The facts insofar as are pertinent to this certification will be set forth in the opinion that follows. This request for a declaration of property rights was initiated by the owners of filled land formerly part of Narragan-sett Bay and the owners of lands that presently abut the bay. The issue involves the ownership rights of land reclaimed from the sea by the placing of fill below mean high tide. The specific questions to be addressed are: Is the fee-simple absolute title to tidal land, which may have been filled as early in our history as the 1700s, in the private-record title holders? Or does the state hold such land for public-trust purposes?

For the reasons that follow, our answers to these questions favor plaintiffs, the private-record title holders. We specifically limit our holding regarding the "Harbor Line" parcels, to the electric-company parcel and the gas-company parcel and no other at this time.

## I

### The "Cove Lands" Filled Properties

█ Two of the properties at issue are known as the Cove Lands parcels. They are located in what was the former Great Salt Cove, an area of Providence, which in the seventeenth and early eighteenth century was a tidal saltwater cove several hundred acres in area. Both of these properties are located on land known as the Cove Lands, which was created by the placing of fill below mean high tide in this saltwater cove, eventually filling in the cove completely.

### A

### RISD Parcel

The first Cove Lands parcel is held by the Rhode Island School of Design (RISD). The plaintiff RISD is a legislatively chartered Rhode Island nonprofit corporation and is the record owner of a three-story building located on the eastern side of South Main Street and the northern side of College Street in Providence and known as the Market House. This three-story building was constructed in 1773, after being funded by a lottery authorized by the General Assembly, and served as the center of commerce for the

---

1. Amici curiae briefs were filed in support of the plaintiffs' position by Capital Properties, Inc., Citizens Savings Bank, Fleet National Bank, Johnson & Wales University, Rhode Island Hospital Trust National Bank, and New England Legal Foundation and Newport Realty, Inc. Likewise, amici curiae briefs were filed in support of the defendants' position by the Coastal States Organization, Inc., Conservation Law Foundation, and Save the Bay, Inc.

then-infant port city of Providence. Currently this building is utilized to house college classrooms and school offices. RISD acquired the title to this parcel of land by deed from the city of Providence, dated May 27, 1948, which was duly recorded in the city's land evidence records.

### B

### Chamber of Commerce Parcel

The other Cove Lands parcel is used as an office building by plaintiff Greater Providence Chamber of Commerce (the Chamber of Commerce), a legislatively chartered Rhode Island nonprofit corporation. As stipulated in the record, plaintiff Chamber of Commerce has an ownership interest in the lessee of a three-story office building located at the corner of West Exchange Street and Francis Street in Providence, and it is a beneficiary of an option to purchase the Chamber of Commerce parcel. The Chamber of Commerce property was the former West Building of the Union Station Complex, which was built between 1896 and 1898.

Neither the RISD parcel nor the Chamber of Commerce parcel now borders on navigable or tidal water.

### C

### Conclusion

By deed dated May 14, 1870, the State of Rhode Island conveyed title to the former Cove Lands to the city of Providence (the Cove Lands Grant). The Cove Lands Grant was authorized by a General Assembly Resolution (the Cove Lands Resolution).

■ The question pertaining to these two Cove Lands parcels is whether the public-trust doctrine was extinguished in the Cove Lands by the state's express grant of those lands to the city of Providence in 1870. We hold that it was extinguished. The Cove Lands grant is an example of the principle that the public-trust doctrine can be extinguished by a valid legislative state grant. This court's decision in *City of Providence v. Comstock*, 27 R.I. 537, 65 A. 307 (1906), aptly demonstrates why, in the instance of the Cove Lands parcels, an express legislative

grant was appropriate. In *Comstock* this court noted a unique circumstance peculiar to the Cove Lands:

"Various steps were taken to preserve the cove as a feature of the landscape and for supposed sanitary or hydraulic reasons from that time until it was finally filled in 1892, but no legislation for nearly a hundred years has recognized any riparian or littoral rights in the owners of the lands bordering on the original lines of the salt water. Streets were laid out around it for the express purpose of excluding such claims by cutting off the access of those proprietors to the channel, and in all such layouts it was agreed that no damage was done to private owners." *Id.* at 549, 65 A. at 311.

In addition, special legislation pertaining to the Cove Lands, for example, legislation in 1841 prohibiting any construction in the cove *without city consent* and subsequent legislation authorizing the railroads to fill land in the cove for railroad purposes, were unique circumstances pertaining only to the Cove Lands. This court noted in *Comstock* that despite such activity, no private owners claimed that their riparian rights had been infringed, and the court stated that "all private *littoral rights* in the waters of the cove, such as the defendants now claim, had been extinguished." *Id.* at 551, 65 A. at 312. Last, the General Assembly in 1867 revoked all grants of any portions of the Cove Lands that had not been accepted and the conditions of which had not been fulfilled. *Id.* at 553, 65 A. at 312.

It is for the foregoing reasons that an express legislative grant was necessary and appropriate to convey an interest in the Cove Lands free of the public-trust doctrine. Clearly the construction of public streets between private property and saltwater in order to prevent riparian rights from arising, and special legislation dealing with the Cove Lands, called into direct question the status of any common-law riparian rights, thus distinguishing the Cove Lands parcels from the two Harbor Line parcels that we shall consider below.

We hold that the Cove Lands deed of 1870 constituted a valid legislative grant, and plaintiffs, RISD and the Chamber of Commerce, own their respective Cove Land parcels in fee-simple absolute.

## II

### The "Harbor Line" Filled Properties

■ The other two properties at issue are located on the Providence River where land was reclaimed by filling below mean high tide out to a harbor line. The plaintiff electric company owns approximately 8.31 acres of land in Providence bounded on the east by Eddy Street, on the west by the Providence River, and on the south by South Street. This parcel presently contains land created by filling below the high-water mark as it existed in 1857. This filling occurred between 1857 and 1886 and did not extend beyond the harbor line established in the Providence River in April 1879 or beyond any prior harbor line. The eastern boundary of this parcel is located along that harbor line. The filling of this property below mean high tide occurred prior to the electric company's ownership. There is nothing in the record to indicate that this filled parcel of land was filled with the express approval of the state. However, it is safe to assume that such filling would not have been allowed to occur in a busy waterway without at least the state's tacit approval, if not its express approval. This parcel is known as the South Street Station and has served as an electrical energy generating and transmission facility since the early 1920s.

The plaintiff gas company is the owner of approximately 16.5 acres of land in Providence situated to the east of Allens Avenue, north of Terminal Road, and west of (and bounded by) the Providence River, on which the gas company constructed a coal-gas plant between 1909 and 1910. This parcel includes land created by filling below the highwater mark as it existed in 1911. This filling below the high-water mark did not extend beyond the harbor line in the Providence River established in April 1880, and the eastern boundary of that parcel is located along that harbor line. Permits were issued by the Rhode Island Board of Harbor Commissioners for such filling in 1907, 1909, and 1914. Currently this property is used as a facility for the conversion of liquified natural gas as well as for the distribution of natural gas.

The question to be resolved regarding these two Harbor Line parcels involves an analysis of state law regarding whether the creation of land by filling below mean high tide extinguishes the public-trust rights in the land so reclaimed. We conclude that plaintiffs electric company and gas company hold title to the real estate in question in fee-simple absolute. We reject the state's contentions that the Harbor Line properties were required to have been the subject of express legislative grants or legislative conveyances to convey an interest in those parcels free of the public trust.

We are informed that as a result of our opinion in *Hall v. Nascimento,* 594 A.2d 874 (R.I.1991), it has been argued that all land created by the placing of fill below the mean high tide remains subject to the public-trust doctrine. This interpretation has caused concern in that these plaintiffs' titles in their properties described above may be adversely affected. It is hoped that our opinion in this action for declaratory judgment will clarify the situation.

### A

### The Public Trust Doctrine

■ The public-trust doctrine holds that the state holds title to all land below the high-water mark in a proprietary capacity for the benefit of the public. *Nugent ex rel. Collins v. Vallone,* 91 R.I. 145, 152, 161 A.2d 802, 805 (1960). In benefiting the public, the doctrine preserves the public rights of fishery, commerce, and navigation in these waters. *Id.* See also *City of Providence v. Comstock,* 27 R.I. 537, 65 A. 307 (1906); *New York, N.H. & H.R.R. Co. v. Horgan,* 25 R.I. 408, 56 A. 179 (1903).

The root concepts of the doctrine reach back to the very early years of Western civilization:

"For centuries, [land covered by the sea] has been recognized as having a peculiar nature[.] * * * Historically, no developed

western civilization has recognized absolute rights of private ownership in such land as a means of allocating this scarce and precious resource among the competing public demands. Though private ownership was permitted in the Dark Ages, neither Roman Law nor the English common law as it developed after the signing of the Magna Charta would permit it." *United States v. 1.58 Acres of Land Situated in Boston,* 523 F.Supp. 120, 122–23 (D.Mass.1981).

The doctrine was part of English common law, to which Rhode Island and the other original colonies adhered after gaining their independence. In *Shively v. Bowlby,* 152 U.S. 1, 57, 14 S.Ct. 548, 569, 38 L.Ed. 331, 352 (1894), the Supreme Court stated:

> "At common law, the title and the dominion in lands flowed by the tide were in the King for the benefit of the nation. Upon the settlement of the Colonies, like rights passed to the grantees in the royal charters, in trust for the communities to be established. Upon the American Revolution, these rights, charged with a like trust, were vested in the original States within their respective borders, subject to the rights surrendered by the Constitution to the United States."

States that were subsequently admitted into the Union after the adoption of the Constitution were guaranteed the same rights as the original thirteen states in tide waters and the lands under them within their respective jurisdictions. *Id.* Thus the public-trust doctrine was firmly and pervasively embedded in American jurisprudence. Such common law is in force in Rhode Island "except as it has been changed by local legislation or custom." *Comstock,* 27 R.I. at 543, 65 A. at 308. As the Supreme Court noted in *Shively,* "The common law of England upon this subject, at the time of the emigration of our ancestors, is the law of this country, except so far as it has been modified by the charters, constitutions, statutes or usages of the several Colonies and States, or by the Constitution and laws of the United States." 152 U.S. at 14, 14 S.Ct. at 553, 38 L.Ed. at 337.

■ The principle espoused by the English common-law public trust jurisprudence

recognizes the unique resource that tidal waters constitute and the necessity that they be held by the sovereign in a trustee capacity for the use and benefit of all citizens. Thus these lands below the high-water mark will not be appropriated by, or conferred upon, private individuals for purely private benefit. It is this principle that forms the foundation of the public-trust doctrine in Rhode Island as well as in the other states.

B

The Public Trust Doctrine as
a Doctrine of State Law

The laws of our sister states are not always helpful to a determination of the law of the State of Rhode Island regarding the public-trust doctrine because each state has applied it in ways peculiar to that state. As noted in *Shively:*

> "The foregoing summary of the laws of the original States shows that there is no universal and uniform law upon the subject; but that each State has dealt with the lands under the tide waters within its borders according to its own views of justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether owners of the adjoining upland or not, as it considered for the best interests of the public. Great caution, therefore, is necessary in applying precedents in one State to cases arising in another." 152 U.S. at 26, 14 S.Ct. at 557, 38 L.Ed. at 341.

Accordingly, this inquiry will focus on the laws of Rhode Island and will include the customs and usages relating to the public-trust doctrine from our early colonial history to the present, and we shall refer to other state and federal decisions where helpful.

Rhode Island decisional law and this court have never cast aside the public-trust doctrine. As a matter of fact, this court has consistently cited federal decisions that embrace this well-articulated body of general law. *See Hall v. Nascimento,* 594 A.2d 874, 877 (R.I.1991) (citing *Phillips Petroleum Co. v. Mississippi,* 484 U.S. 469, 473, 108 S.Ct. 791, 794, 98 L.Ed.2d 877, 884 (1988) (recounting the pervasiveness of the public-trust doc-

trine in American jurisprudence), (*Shively,* 152 U.S. at 57, 14 S.Ct. at 569, 38 L.Ed. at 352) (same), and (*Illinois Central R.R. v. Illinois,* 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892) (firmly established that title to lands below the high-water mark vests in the several states as trustees for the public)); *State v. Ibbison,* 448 A.2d 728, 731 (R.I.1982) (citing *Martin v. Waddell,* 41 U.S. (16 Pet.) 367, 10 L.Ed. 997 (1842) (embracing the developing body of general law known as the public-trust doctrine)); *Comstock,* 27 R.I. at 542–43, 547, 65 A. at 308 (citing *Shively* and *Illinois Central*); *Providence Steam–Engine Co. v. Providence & Stonington Steamship Co.,* 12 R.I. 348, 360 (1879) (Potter, J., concurring) (citing *Martin v. Waddell*).

## C.

### Hall v. Nascimento

*Hall v. Nascimento,* 594 A.2d 874 (R.I. 1991) is one of the few instances in which this court has had the opportunity to resolve a conflict between public rights and private rights in filled land along the shore. In *Hall* we decided a title dispute concerning land on Common Fence Point in Portsmouth. The basic issue involved title to 10 feet of former beach area that abutted 260 feet of contiguous land created by the placing of fill from the shore line out into Mount Hope Bay. This land was primarily created by fill from the dredging of Mount Hope Bay in 1948 by the Army Corps of Engineers. The state granted permission for the fill to be placed along the shore to a width of 50 feet as set forth in the written permits. The area actually filled, however, extended 260 feet away from the original shore, which created a 270–foot deep area of new shoreline. In *Hall* we held that the trial justice erred in awarding title of a portion of the 270–foot area to an adjacent lot owner. We reasoned that any such claim must be based on littoral rights to the tidal lands that were filled. *Id.* at 876. Because the lot owner's predecessors in title *never* abutted the former high-water mark, the present lot owner could not claim any littoral rights. *Id.*

The *Hall* decision has generated an uneasiness in landowners by casting into doubt the title status of numerous private properties throughout this state that are composed wholly or in part of filled tidal land. Following our holding in *Hall,* some state agencies took the position that the State of Rhode Island holds title to all filled tidal lands in trust for the public under the public-trust doctrine.

Let us state now, unequivocally, that *Hall* has no application to the situation of the Cove Lands in this case or to the gas company's or the electric company's properties landward of the Harbor Lines. *Hall* involved filling in an area with no harbor line and no legislative authorization. Although there was a permit from the Rhode Island Department of Public Works, Division of Harbors and Rivers, the actual filling was more than five times as extensive as that authorized by the permit.

This court continues to support the opinion rendered in *Hall.* It was correct at the time it was made and it is still appropriate. *Hall* does not hold that if there is no valid legislative state grant, public-trust rights exist in land filled to a harbor line. The decision only acknowledges that the state *may* grant property free of the public-trust doctrine, but there was no evidence of such a grant in that record of that case. It was determined in *Hall* that the plaintiffs did not hold title to the ten-foot beach area or the filled area adjacent to it either by deed or by adverse possession. The filled land in *Hall* was never developed for commerce or built upon. Rather it was dedicated to public open space by a neighborhood association. Having established the ownership status of the state in regard to the land in question, this court concluded that the trial justice erred in granting the plaintiffs title by adverse possession because a private party cannot adversely possess public property.

The gas-company parcel involved filling of the property to a harbor line with the express approval of the state. The electric-company parcel involved filling of the property to a harbor line with the tacit or implied approval of the state. The two Harbor Line parcels have been substantially improved upon for many years. We hold that these factors establish that the fee-simple absolute

title rests in the title holders, the electric company and the gas company, subject, of course, to any encumbrances that the title holders may have placed on the land themselves.

■ In our analysis regarding the title to these Harbor Line parcels, we have read with interest the dicta in several late-nineteenth-century opinions of this court. In *Engs v. Peckham*, 11 R.I. 210 (1875), this court stated, in its judgment, that the filling of land to a harbor line "excluded" the public-trust rights in such property. In *Allen v. Allen*, 19 R.I. 114, 32 A. 166 (1895), this court again said that in its judgment filling of land to a harbor line "extinguished" the public-trust rights in such property. The harbor lines were drafted in cooperation between state and local authorities to establish the point beyond which fill, wharves, and other structures would create an obstruction to navigation, commerce, and fishery. The opinions just referred to reflect the state of mind in those who created harbor lines, and they confirm our conclusion that the state is in error in arguing that only an express legislative grant can extinguish the public trust in filled land. The state is correct in its assertion that harbor lines establish boundaries up to which filling could occur. The harbor lines were a legislative determination, generally made in conjunction with the local government, that encroachment on the waters to the harbor line would not constitute interference with fishery, commerce, or navigation.

■ We realize that our opinion, while clarifying the limited application that *Hall* has, will not finally resolve the status of all the many parcels of land along our shore that are made of partially or wholly filled land where no harbor lines are involved. In an effort to resolve some concerns that will remain, we adopt a two-part test that can be used to establish ownership rights in filled tidal lands. The test should be applied on a case-by-case basis according to the facts in each situation.

A littoral owner who fills along his or her shore line, whether to a harbor line or otherwise, with the acquiescence or the express or implied approval of the state *and* improves upon the land in justifiable reliance on the approval, would be able to establish title to that land that is free and clear. The littoral owner may pursue a course of action seeking to convey the deed to that property to himself or herself and become owner in fee-simple absolute *provided* that the littoral owner has not created any interference with the public-trust rights of fishery, commerce, and navigation. Once the littoral owner acquires title to the land in this manner, the state cannot reacquire it on the strength of the public-trust doctrine alone. The state can, however, at any time, place restrictions on the filling in of shoreline provided it does so before a landowner has changed position in reliance on government permission.[2]

The state asserts alternately, without citation or authority, that these plaintiffs have a "license [from the state] to exclusively occupy the premises [subject, of course, to existing regulatory schemes]," and that the public rights in both parcels "are not self-executing, but must await affirmative legislative action in order to be exercised." We disagree.

A license is a revocable interest under Rhode Island law. Any property subject to a license from the state would be virtually unalienable. It would create a situation in which large amounts of valuable private properties would be worthless on the real estate market. For these reasons alone this option advanced by the state must fail.

Although this court's early decisions did use the word "license" in conjunction with filling, it was used in the context that the establishment of a harbor line constituted a license, that is, permission, or an invitation, to fill to the harbor line. Once the invitation was accepted or the permission was acted upon, the upland owner who relied on the government permission acquired title from the state. *Allen*, 19 R.I. at 116, 32 A. at 167 ("a harbor line permits the riparian owner to carry the upland * * * out a certain distance

---

**2.** We are not to be construed as suggesting that a littoral owner may obtain preemptive rights against the state by adverse possession.

from the natural shore[,] [a]ctual extension of the upland to the new line extinguishes all public rights within it"); *Bailey v. Burges,* 11 R.I. 330, 331–32 (1876) ("the riparian proprietor * * * [who] fills out by the permission or acquiescence of the state * * * will take the land so filled * * * from the state"); *Clark v. Peckham,* 10 R.I. 35, 38 (1871) ("[s]o long as the dock is not filled by the owner of the bank, it is subject to the *jus publicum* of being used for passage by the whole public").

Clearly the argument advanced by the state regarding a license is without merit.

For the foregoing reasons we decide this request for a declaration of property rights in favor of the named plaintiffs and declare that they each hold fee-simple absolute title to the ownership rights of the land reclaimed from the sea by the placing of fill below mean high tide.

LEDERBERG, J., did not participate.