**PROVIDENCE & WORCESTER RAILROAD CO.**

v.

**Jeffrey PINE in His Capacity as the Attorney General for the State of Rhode Island et al.**

No. 97–107–Appeal.

Supreme Court of Rhode Island.

April 23, 1999.

John Tarantino, Kristen W. Ulbrich, Providence, for Plaintiff.

John Boehnert, Deming E. Sherman, Providence, Michael Malamut, Boston, MA, Michael L. Rubin, Brian A. Goldman, Providence, for Defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

In this appeal we review a summary judgment entered in favor of the plaintiff on its petition to quiet title to some 32.9 acres of filled tide-flowed land within an existing harbor line in the Providence River, south of the Wilkesbarre Pier in the city of East Providence.[1]

The plaintiff is the Providence and Worcester Railroad Co. (P & W).[2] The defendants are the State of Rhode Island by its Attorney General and the Coastal Resources Management Council (CRMC or collectively the defendants). The final judgment entered in the Superior Court declared P & W to have fee simple title in the 32.9 acres of filled tide-flowed land.

P & W is the upland owner of the property situated along the original shoreline on the Providence River in East Providence that immediately abuts the 32.9 acre parcel of the tide-flowed land concerned in this appeal.

On January 28, 1974, P & W filed an application with CRMC seeking permission or an assent, from CRMC, to construct a quay by filling in the 32.9 acres of tide-flowed land up to the existing harbor line.[3] Hearings on the application took place on October 15, 22, 29 and November 7, 1974. On April 2, 1975, CRMC granted the P & W application "in its entirety." It found as fact that there did not presently exist any CRMC management plan or program for the area in which the quay was to be constructed; that P & W's proposed dredging and filling of the tide-flowed land and construction of its quay to permit off loading between ships and railroad cars would not interfere with navigation in the Providence River[4] and would not create any environmental hazard; and that it would bring about desirable economic activity in an area "which is presently in a state of deterioration and decay." CRMC additionally found that P & W's construction of the quay would not be "inconsistent with the total policies of the State's land use plan. The port expansion of the Providence Port area could further the State's economic development objectives and would be an appropriate use of the coastal location."

Following CRMC's April 2, 1975 decision granting P & W's application to construct the quay, Union Oil Company of California (Union), one of the objectors to P & W's applications, filed an appeal in the Superior Court challenging the propriety

---

1. P & W's memorandum in support of its original coastal application states:

   "The proposed quay to be developed in the East Providence harbor of the Providence River, immediately south of the Wilkes–Barre Pier, will be approximately two thousand feet in length and will parallel the eastern channel line of the Fox Point Reach. The area of the completed quay will be approximately 47 acres of land with 4.6 acres of water dockage, for a total of about 51.6 acres."

2. Amici curiae briefs were filed in support of the plaintiff's position by the East Providence Chamber of Commerce and the New England Legal Foundation.

3. The original application was supplemented by revision of the original plan for construction on May 22, 1974 and July 8, 1974.

4. P & W's quay in its application, and as approved by CRMC is described as:

   "* * * proposed sheet steel piling bulkhead as being of 3,760 linear feet and to be about 10 feet high above the mean low water mark. Permission is sought to dredge to a 40 foot depth approximately 287,000 cubic yards in front of the bulkhead. Dredged material is to be deposited behind the bulkhead. About 713,000 cubic yards of additional fill, to be supplied from other sources, is to be placed behind the bulkhead. * * * The structure is intended to permit off-loading between ships and railroad cars as a deep water facility, and applicant, Providence and Worcester Company would plan to extend its rail freight facilities into the area as part of the project."

of the CRMC decision.[5] That appeal was later dismissed by Union on June 30, 1976, pursuant to an agreement between P & W and Union, whereby concerns regarding oil pipeline easements and rights-of-way owned by Union and Getty Oil Company were resolved. On that same day, June 30, 1976, CRMC issued "Assent No. 53–Providence River" to P & W. That assent required that "[a]ll work being permitted must be complete within ten (10) years * * *." In addition, the assent provided for certain stipulations, noted on its reverse side that read in part:

"B. This Assent is granted with the specific proviso that the construction authorized therein will be maintained in good condition by the owner thereof, his heirs, successors, or assigns for a period of fifty (50) years from the date hereof, after which time this permission shall terminate necessitating either complete removal, or a new application.

"C. In accordance with a decision of the Coastal Resources Management Council on October 9, 1973, this Assent is granted with the proviso that it is subject to the imposition of a usage fee to be established by the Coastal Resources Management Council."

P & W, pursuant to the CRMC June 30 assent, proceeded to make application to obtain all required federal permits for its intended construction project. All such necessary permits were obtained. P & W then commenced the dredging required along the proposed 3,760 linear feet of its steel sheet piling bulkhead and also placed the required suitable fill behind the bulkhead to ensure its stability. Because of construction delays, however, it became necessary for P & W to request from CRMC an extension of time within which to complete the work required under the original CRMC assent. By May of 1986, P & W had expended some five million dollars on its proposed but yet uncompleted project. On May 30, 1986, P & W filed an application with CRMC requesting a ten-year extension within which to complete the work called for under the June 30, 1976 assent. P & W's application was approved and on June 13, 1988, CRMC granted a ten-year extension for completion of the project.

On April 25, 1995, this Court issued its opinion in *Greater Providence Chamber of Commerce v. State of Rhode Island,* 657 A.2d 1038 (R.I.1995) (*Chamber of Commerce*). In that opinion we acknowledged that our earlier opinion in *Hall v. Nascimento,* 594 A.2d 874 (R.I.1991) had caused concern with regard to ownership and title to land created by the placing of fill below the mean high-tide mark by abutting upland property owners. We noted our conclusion in *Hall* that the public-trust doctrine in Rhode Island, as well as in other states, decreed that lands filled below the mean high-water mark by upland property owners could not be appropriated by those private individuals for purely private benefit. *Chamber of Commerce,* 657 A.2d at 1042. "Following our holding in *Hall,* some state agencies took the position that the State of Rhode Island holds title to all filled tidal lands in trust for the public under the public-trust doctrine." *Id.* at 1043.

In *Chamber of Commerce,* we reaffirmed what had been said earlier in *Hall,* but limited *Hall's* application to the particular facts present in that case. We then, "[i]n an effort to resolve" some of the title concerns that had emanated from *Hall,* adopted a "two-part test" to be used in determining ownership rights in filled tidal water lands, and cautioned that it should be employed "on a case-by-case basis according to the facts in each situation." *Chamber of Commerce,* 657 A.2d at 1044. We explained the two part test as:

"A littoral owner who fills along his or her shore line, whether to a harbor line or otherwise, with the acquiescence or the express or implied approval of the state *and* improves upon the land in

justifiable reliance on the approval, would be able to establish title to that land that is free and clear. The littoral owner may pursue a course of action seeking to convey the deed to that property to himself or herself and become owner in fee-simple absolute *provided* that the littoral owner has not created any interference with the public-trust rights of fishery, commerce, and navigation. Once the littoral owner acquires title to the land in this manner, the state cannot reacquire it on the strength of the public-trust doctrine alone. The state can, however, at any time, place restrictions on the filling in of shoreline provided it does so before a landowner has changed position in reliance on government permission." *Id.*

At the time that our opinion in *Chamber of Commerce* was issued, P & W was in fact one of those littoral owners of land that had been involved with title concerns to filled tide-flowed lands. In the course of its expending millions of dollars to complete the East Providence quay project, it was experiencing project financing difficulties because the various title companies involved in the financing transactions were also concerned with the public-trust holding announced in *Hall.* P & W saw in the *Chamber of Commerce* holding, however, a ray of hope upon which to resolve its title and project financing dilemma. Within seven months of the issuance of our opinion in *Chamber of Commerce,* P & W informed the state, and its prospective title insurers, that it was taking the position that it had dredged and filled some 32.9 acres of tide-flowed land with both the express and implied approval of the state, and thus, it asserted, that it came within the designation of those littoral owners of filled tide-flowed lands described in *Chamber of Commerce* who were entitled as littoral property owners to claim fee simple absolute title to the 32.9 acres that it had filled.

Following the procedure set out in the *Chamber of Commerce* case, P & W, on February 16, 1996, executed and delivered to itself a quitclaim or bargain and sale deed to the filled tide-flowed land and recorded that deed in the land evidence records of the City of East Providence on February 20, 1996. On April 25, 1996, P & W then filed a civil action complaint in the Superior Court in which it sought a declaration and affirmance of its title to the 32.9 acres of filled tide-flowed land described in the February 16, 1996 bargain and sale or quitclaim deed. On January 21, 1997, a Superior Court justice granted P & W's motion for summary judgment; denied the state's motion for summary judgment, and later on January 31, 1997 entered judgment establishing fee title in P & W to the 32.9 acres of filled tide-flowed land described in the February 16 bargain and sale deed. The states appeal is now before us.

I

P & W's Express and Implied Approvals

P & W is the progeny of the Providence and Worcester Railroad Company originally created pursuant to a special legislative charter granted by the Rhode Island General Assembly at its May session in 1844. 1844 R.I. Acts & Resolves p. 34 That charter authorized the Providence and Worcester Railroad Company to take and to own lands necessary to lay out and to locate its intended railroad lines.[6]

On March 9, 1866, the General Assembly enacted an Act establishing a harbor line in the harbor in the town of East Providence, "to which owners of the adjoining upland may fill." 1866 R.I. Acts & Resolves ch. 600 § 1. The "town" of East Providence was given "the power and authority now possessed by the General Assembly * * * to make such provisions relative to the filling and grading, and the building and extending of wharves to said harbor lines as it shall deem best for the

6. Sections 2 and 7 in the 1844 R.I. Acts & Resolves pp. 34, 37.

public interest and convenience." *Id.* at § 2.

Four years later in 1870, at its January session, the General Assembly amended the Act that incorporated the Providence and Worcester Railroad Company (the "1870 amendment", alternatively referred to as the Harbor Line Act). 1870 R.I. Acts & Resolves p. 181. The 1870 amendment in part authorized the company to locate and lay out a branch railroad on "its present road, to some point on Providence River, in East Providence," and to construct a "spur track or tracks" along the Seekonk River at some point or points above the Washington Bridge, "and to construct and use for railroad purposes such wharf or wharves, not extending beyond the harbor line, above and below said bridge, as may be deemed expedient." *Id.* at § 1.

■ P & W asserts that the General Assembly's March 9, 1866 Harbor Line Act granted express permission to P & W to fill to the harbor line established by the Act and, that Act, coupled with the General Assembly's later 1870 Amendment to the Harbor Line Act permitted P & W, for its railroad purposes, to construct and use such wharf or wharves not extending beyond the harbor line. Those two Acts, P & W asserts, constituted the state's prior express, or at least implied, permission to fill in the 32.9 acres of tide-flowed land in contention. Thus, P & W asserts that it meets and satisfies the first prong of the *Chamber of Commerce* test. We agree.

## II

### Justifiable Reliance

The second prong of the *Chamber of Commerce* test requires littoral owners to improve upon the land in justifiable reliance on the state's approval.

The record reveals that since 1873, P & W has been planning for the construction of a wharf or wharves. In 1873, P & W's predecessor acquired waterfront property. Additional lands were later acquired in 1882 and 1976. In 1941, P & W entered into a deed with the New York, New Haven and Hartford Railroad Company and the Colonial Beacon Oil Company in order to reserve rights in the Wilkesbarre Pier under an 1892 lease. In *Providence and Worcester Co. v. Exxon Corp.*, 116 R.I. 470, 488, 359 A.2d 329, 339 (1976), we recognized, in dicta, "that the deeds dated 1873 and 1882[ ] indicate that at least prima facie title to the tide-flowed lands rests in [ ] P & W." We also stated that by reserving a forty-foot wide right-of-way to the Wilkesbarre Pier in 1941, it was reasonable to surmise "that the parties intended the right-of-way to serve as access to the land south of the pier as well as to the pier itself." *Id.* The land south of the pier abuts the parcel now in dispute; the reservation of the right-of-way to this land is further evidence of P & W's longstanding intent to later develop and construct a wharf or port facility to transport its freight and to ship cargo.

P & W asserts here that by acquiring its waterfront property and by filling in the tide-flowed land, P & W demonstrated justifiable reliance upon the state's prior express or implied approval to fill. The defendants dispute P & W's claim of reasonable reliance. They assert that under *Chamber of Commerce*, P & W could not have acquired title until the actual filling had taken place. They contend that the establishment of CRMC followed by CRMC's stipulations in the assent combined to affirmatively extinguish P & W's rights in the property. Instead, the defendants assert that through the assent, CRMC merely granted P & W a restricted fifty-year license to fill-in and use the property.

The record below, however, indicates that during the hearing, the state conceded that there has been no implied repeal of the 1866 Harbor Line Act; therefore, that Act is applicable. Indeed, it is questionable that the state could have repealed the Harbor Line Act after the enactment of

G.L.1956 § 34–1–2, entitled Confirmation of Legislative Conveyances Generally. This statute was enacted in 1896 and stated in pertinent relevant part:

"Whereas, at the first settling of this state and for sundry years afterwards lands were of little or no value and skillful men in the law were much wanted, whereby many deeds, grants and conveyances were weakly made, which may occasion great contests in law if not timely prevented; therefore,

Section 1. All *grants,* charters and conveyances *heretofore made by the general assembly* unto any * * * corporation * * * shall be and they hereby *are ratified and confirmed as good and effectual, to all intents and purposes in law, for the conveying all such* lands, tenements, hereditaments, *rights, privileges* and profits as are therein mentioned, to the said * * * corporations, * * * and to their *respective successors,* heirs and assigns forever." G.L. 1896, ch. 205 § 1. (Emphasis added.)

■ The effect of the 1896 statute was to ratify the grants given to P & W by the 1866 and 1870 Harbor Line Acts to fill in to the harbor line and to construct and use for railroad purposes such wharf or wharvess, not extending beyond the harbor line, above and below the Washington Bridge. P & W and its progenitors demonstrated reliance upon those grants through the acquisition of waterfront property in 1873, 1882 and 1976, and through the reservation of its forty foot wide right-of-way to the Wilkesbarre Pier in 1941.

Indeed, the Superior Court motion hearing justice who granted summary judgment in favor of P & W also recognized the effect of the Harbor Line Acts upon P & W's claim to the tidal filled land. He noted in the judgment entered:

"(b) Providence and Worcester Railroad Company exercised its vested right to fill the land described in' said Bargain and Sale Deed pursuant to *'An Act in Amendment of, and in Addition to, An Act to Incorporate the Providence and Worcester Railroad Company'* enacted by the General Assembly in January 1870 (the '1870 Harbor Line Act'), which said 1870 Harbor Line Act has not been repealed, expressly or impliedly, by the legislation subsequently enacted by the General Assembly which created the Coastal Resources Management Council (R.I.G.L. §§ 46–23–1 *et seq.*) or by any other statute * * *."

■ On the facts before us in this case, we conclude that while the CRMC assent was initially required and necessary in order to permit P & W to commence filling in the 32.9 acre portion of tidal water land owned by P & W, the purpose of the assent merely was to regulate the method and means used by P & W to fill out to the harbor line. CRMC, much like a zoning board or planning commission, may certainly regulate the use of one's coastal land beneath tidal water between high and low water mark, but it may not regulate the title to that land. The state, we believe, misconceives the true role of CRMC in the particular fact scenario of this case.

In 1971, the Legislature established the CRMC and granted it authority to approve proposed developments beneath the tidal water below the mean high water mark. P.L.1971, ch. 279, § 1. The enabling Act stated:

"Any person, firm, or governmental agency proposing any development or operation within, above, or beneath the tidal water below the mean high water mark, extending out to the extent of the state's jurisdiction in the territorial sea shall be required to demonstrate that its proposal would not: (1) conflict with any resources management plan or program; (2) make any area unsuitable for any uses or activity to which it is allocated by a resources management plan or program; or (3) significantly damage the environment of the coastal region. The council shall be authorized to approve, modify, set conditions for, or reject any

such proposal." G.L.1956 § 46–23–6 B, as enacted by P.L.1971, ch. 279, § 1.[7]

The Act gave CRMC the power to "[i]ssue, modify or deny permits for any work in, above, or beneath the water areas under its jurisdiction * * *[,]" (§ 46–23–6(4)(i)), as well as the power to license "the use of coastal resources which are held in trust by the state for all its citizens, and [to impose] fees for private use of such resources." Section 46–23–6(4)(iii).

In 1972, CRMC promulgated regulations requiring anyone intending to fill-in tide-flowed lands to file an application for an assent from CRMC. In 1973, the Legislature authorized CRMC to grant permits for the use of coastal resources for periods of fifty years or in perpetuity.[8] G.L.1956 § 46–23–16 (P.L.1973, ch. 197, § 3). In June of 1976, § 46–23–6(4)(iii) gave CRMC the power to grant licenses and easements, in addition to its power to grant permits, for the use of coastal resources which are held in trust by the state.[9] The defendants contend that through this statutory and regulatory scheme, CRMC was given the authority to grant a fifty-year restricted license to P & W to fill-in and use the property and that when it issued this license, it cut off P & W's claim to fee simple in the filled tide-flowed land.

■ "It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Accent Store Design, Inc. v. Marathon House, Inc.,* 674 A.2d 1223, 1226 (R.I. 1996). "When confronted with statutory provisions that are unclear and ambiguous, however, we examine statutes in their entirety in order to 'glean the intent and purpose of the Legislature.'" *State v.*

*Flores,* 714 A.2d 581, 583 (R.I.1998) (quoting *In re Advisory to the Governor (Judicial Nominating Commission),* 668 A.2d 1246, 1248 (R.I.1996)). "In so doing, we consider the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections." *Sorenson v. Colibri Corp.,* 650 A.2d 125, 128 (R.I.1994).

Sections 46–23–6(4)(i) and 46–23–6(4)(iii) concern separate and distinct powers granted to CRMC. Section 46–23–6(4)(iii) authorizes CRMC to grant licenses, permits and easements for the *use* of coastal resources which are held in trust by the state; whereas, § 46–23–6(4)(i) authorizes CRMC to regulate the issuance of permits for *work* in, above or beneath the water with respect to land and other coastal resources under its jurisdiction.

■ In the instant matter, P & W, in accordance with § 46–23–6(4), filed an application with CRMC for an assent to fill in its tide-flowed land and to construct a wharf for railroad purposes. Because, on the facts in this case, the state had already granted P & W the right to use these coastal resources through the Harbor Line Acts and G.L. 1896, ch. 205, § 1, CRMC could only grant an assent to P & W to *work* on its tide-flowed property rather than *use* coastal resources which are held in trust by the state. The fact that P & W was required to seek a permit from CRMC is of no consequence in this matter because CRMC had only the power to oversee and direct the method by which P & W could fill in the tide waters to the harbor line established in 1896. Once P & W filled-in and improved that land below the mean high-water mark, it established title there-

---

7. This section has been redesignated as G.L. 1956 § 46–23–6(2)(ii). The relevant language of the CRMC statute remains essentially unchanged and, for the sake of clarity, we will cite to the current version in this opinion.

8. Although not before us, the granting of a permit in perpetuity by the CRMC could con-

ceivably implicate concerns of an impermissible delegation of legislative authority. *See* R.I. Const. art. VI § 11 (formerly, Section 14 of Article IV).

9. P.L.1976, ch. 329, § 1.

to, free and clear of the public trust claim asserted by the state.

For the reasons herein above set out, the defendant's appeal is denied and dismissed. The summary judgment is affirmed, and the papers in this case are remanded to the Superior Court.