DECISION
This matter comes before the Court on plaintiffs' Motion for Declaratory Judgment Jurisdiction of this Court is pursuant to G.L. 1956 (1997 Reenactment) § 9-3O-1, et seq., and R.I. Super. R. Civ. P. 57.
 Facts/Travel
On or about March 2, 1993, plaintiffs filed a Complaint seeking temporary and permanent injunctive relief enjoining defendants from adding tires currently stored or disposed of on their property (the "Davis site"). To protect the environment from fire or other disastrous consequences as a result of the number of tires on the Davis site, an Order was entered in this matter on December 7, 1994 delineating a Site Stabilization Plan. Under the Site Stabilization Plan, defendants were to create fire control lanes on the property and remove the tires through a series of contracts.
The current contract with Casella Tires, Inc. contains the removal of up to seven million scrap tires over a period of five years ending on June 30, 2004. The continuation of the contract is on a yearly basis and is dependent upon the availability of funds for payment of the tire removal. The funds for 1999 have been exhausted. It should be noted that a source of binds called the Vehicle Tire Tax Restricted Receipt account has been repealed, and no further funds are available to utilize in this matter.
To be in compliance with the Site Stabilization Plan and the removal contract in 2000, plaintiff Department of Environmental Management ("DEM") has assigned $750,000 from the Oil Spill Prevention, Administration and Response Fund (the "OSPAR Fund"), established pursuant to G.L. 1956 (1996 Reenactment) § 46-12.7-1, et seq., to continue the tire removal process from the Davis site. The plaintiffs have filed a Motion for Declaratory Judgment asking the Court to declare the expenditure of money from the OSPAR Fund to be consistent with the statutory purposes of § 46-12.7-1, et seq.
 Standard of Review
Under the Uniform Declaratory Judgments Act (the "Act"), this Court "shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." G.L. 1956 (1997 Reenactment) § 9-30-1. The purpose of the Act is to "render disputes concerning the legal rights and duties of parties justiciable without proof of a wrong committed by one party against another, and thus facilitate the termination of controversies." Millett v. Hoisting Eng'r Licensing Div. ofthe Dep't of Labor, 119 R.I. 285, 291, 377 A.2d 229, 233 (1977) (citations omitted). However, an actual controversy between the parties is a prerequisite to the granting of declaratory relief as the Court may not render advisory opinions or adjudicate hypothetical issues. Id. Even if the facts of a case bring it within the purview of the Act, there is no duty imposed on the Court to grant such relief but rather the Court may exercise its discretion as to whether it should award the relief requested.Sullivan v. Chafee, 703 A.2d 748, 751 (R.I. 1997).
 Declaratory Judgment "It seems to me very important that the statute laws should be made as plain and intelligible as possible and be reduced to as small a compass as may consist with the fullness and precision of the will of the legislature and the perspicuity of its language. This, well done, would, I think, greatly facilitate the labors of those whose duty it is to assist in the administration of the laws and would be a lasting benefit to the people by placing before them, in a more accessible and intelligible form, the laws which so deeply concern their interests and their duties."
Abraham Lincoln, Annual Message to Congress, December 3, 1861.
In 1994, the Davis site contained approximately ten million tires. As a result of the Site Stabilization Plan, tire removal contracts, cooperation among the pates, and oversight by this Court, the Davis site currently contains approximately six million tires. The plaintiffs argue that the greatest environmental threats as a result of the amount of tires stored at the Davis site is fire and the production of petroleum and petroleum by-products from the incomplete combustion of the tires. The plaintiffs contend that each tire has the potential of releasing approximately one quart of oil at the Davis site. If a fire occurs, the tires at the Davis site could potentially release more than one million gallons of oil into the air, land, and water as the Davis site is hydrologically connected directly to the Woonasquatucker River, which is part of the Narragansett Bay estuary.
The plaintiffs have submitted the affidavits of Stephen G. Morin., the Administrator for the Environmental Response in the Rhode Island Department of Environmental Management. Recognizing that petroleum runoff from a tire pile is a major environmental hazard, Mr. Morin was appointed to prepare a plan to respond to a fire at the Davis site. Mr. Morin maintains that a tire fire poses a threat to human health and the environment.
In support of his position, Mr. Morin cites to a tire fire in Westley, California which contained approximately seven million tires, of which five million tires caught fire. The fire began on September 22, 1999 as a result of lightening, and continued to burn as of October 18, 1999, the date of Mr. Morin's affidavit. Since the inception of the Westley fire, 200,000 gallons of oil have been generated. The pool of oil in Westley had caught fire at least once and caused a fallout of "black ran" throughout the region. Mr. Morin asserts that the same oil response techniques used in the Site Stabilization Plan are being followed at the Westley site. Furthermore, if the Davis site caught fire, the repercussions to human health and the environment would mimic those of the Westley fire except that the Westley fire is contained in the desert and does not pose any threat to the ocean environment as does the Davis site. Mr. Morin also cites a tire fire in Ohio that caused the following health and environmental hazards: toxins in the air; heavy soot that burns lungs and irritates eyes (a twenty pound tire can produce two pounds of oil-laden soot); smoke containing heavy metals from the steel belts and chemicals such as carbon disulfide and acrylonitrile used in the production of synthetic rubber; and chemicals causing cancer (although officials are not as concerned about this from such brief, intense experiences), brain damage, and blood poisoning.
In response, intervenors (Mobil Oil Corporation, Exxon Corporation d/b/a Exxon Company USA, Motiva Enterprises LLC, and Sunoco, Inc. (RM)) argue that the OSPAR Fund was enacted to protect Narragansett Bay against damage from a specific environmental hazard, oil spills only. Additionally, the intervenors maintain that the OSPAR Fund was enacted as a direct response to the North Cape oil spill on January 20, 1996 (the "1996 oil spill") enabling the State of Rhode Island to promptly address the costs of response, containment, and cleanup of an oil spill.
The intervenors also assert that the plain language of the OSPAR Fund clearly and unambiguously addresses only the cleanup of oil spills or threatened oil spills into the marine environment, as evidenced by the title and contents of the statute. The intervenors contend that plaintiff's interpretation of the OSPAR Fund is contradictory to the legislative history available for review, which is the transcript of the actual floor debates in the General Assembly that occurred during the 1996 legislative session prior to the passage of the OSPAR Fund. The transcript indicates that the OSPAR Fund was enacted as a direct response to the 1996 oil spill, and no discussion addressed any other type of environmental cleanup. The intervenors argue that if the General Assembly intended to include tire cleanup in the OSPAR Fund it would have specifically addressed the issue. Furthermore, the intervenors maintain that if plaintiffs interpretation of the OSPAR Fund is to be given credence, an absurd result would occur in that any environmental disaster involving any type of petroleum product released into the environment would be able to access the fund.
The task of this Court in construing a statute is to "`establish and effectuate the intent of the Legislature.'" WayneDistrib. Co. v. Rhode Island Comm'n For Human Rights,673 A.2d 457, 460 (R.I. 1996) (quoting Rhode Island State Labor RelationsBd. v. Valley Falls Fire Dist., 505 A.2d 1170, 1171 (R.I. 1986)). The intent of the Legislature is determined "by examining the language, the nature, and the object of the statute while giving its words their plain and ordinary meaning." CJ Jewelry Co.,Inc. v. Department of Employment and Training, Bd. of Review,702 A.2d 384, 385 (R.I. 1997). "It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." Providence Worcester R Co. v. Pine, 729 A.2d 202, 208 (R.I. 1999) (quotingAccent Store Design, Inc. v. Marathon House, Inc., 674 A.2d 1223, 1226 (R.I. 1996)). If the statutory provisions are unclear and ambiguous, this Court must examine the statutes in their entirety in order to "glean the intent and purpose of the Legislature."Id. (citations omitted). "In so doing, we consider the entire statute as a whole; individual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections." Sorenson v. ColibriCorp., 650 A.2d 125, 128 (R.I. 1994).
The purpose of the OSPAR Fund is as follows:
 "The legislature finds and declares that the release of oil or hazardous substances into the environment presents a real and substantial threat to the public health and welfare, to the environment, and to the economy of the state. The legislature therefore concludes that it is in the best interest of the state and its citizens to provide a readily available fund for the payment of expenses that the department of environmental management incurs in the protection of the environment of the state from the release of oil. The legislature further recognizes the considerable hardships which may be incurred by the citizens of the state as a direct result of the release of oil into the marine environment, and therefore the legislature concludes that it is in the best interest of the state to expand the scope of the fund to allow claims from citizens, in certain instances, and to provide for the disbursal of emergency loans from the fund. The legislature lastly concludes that preparedness is an essential component of prevention of and response to oil spill events and therefore the purpose of the fund shall be further expanded to support the development of safety committees, response teams, and other discreet units whose activities will directly benefit the state in the event of future oil spill events." G.L. 1956 (1996 Reenactment) § 46-12.7-1 (Emphasis added).
As such, the purpose of the OSPAR Fund specifically allows the State to respond to actual, potential, or the threatened release of oil, petroleum products, and their by-products into the environment. Furthermore, § 46-12.7-51 (2) allows the director of the Fund to use money for site evaluation activities that include, but are not limited to, "site mapping, installation of wells and equipment, collection, monitoring, and analysis of samples of air, soil, and/or water, and evaluation of the impacts of contamination of marine and terrestrial environments, production of reports, and implementation and maintenance of necessary technology, and equipment for complete remedial action."
The OSPAR Fund allows the director to expend money in the following instances:
 "(1) The director may only expend money from the fund if a discharge of oil has occurred, or the threat of a discharge has led the state to take a appropriate response and the following determinations have been made:
 (a) A responsible party does not exist or the responsible party is unable or unwilling to provide adequate and timely cleanup and to pay for the damages resulting from the spill. The director shall make a reasonable effort to have the responsible party remove the oil or agree to pay for any actions resulting from the spill that may be required by law, provided that the efforts are not detrimental to fish, plant, animal, or bird life in the affected waters. The reasonable effort of the director shall include attempting to access the responsible party's insurance or other proof of financial responsibility.
 (b) Federal oil spill funds are not available or will not be available in an adequate period of time. Notwithstanding this paragraph, the director may expend money from the fund for authorized expenditures when a reimbursement procedure is in place to receive reimbursements from federal oil spill funds." § 46-12.7-81 (Emphasis added).
Although § 46-12.7-81 sets forth various situations in which a disbursement shall be made from the Fund, the pertinent section applicable in this matter provides for disbursements from the Fund for "[a]ll costs, including without limitation personnel undertaking oil spill response activities and equipment expenses, involved in the removal of oil, the abatement of pollution and the implementation of remedial measures including restoration of water supplies, related to the release of oil, petroleumproducts, and their by-products covered by this subchapter." § 46-12.7-81(2)(b) (Emphasis added).
A tire is composed of coal, petroleum, natural gas, and acetylene. The Concise Columbia Encyclopedia 715 (2d ed. 1989). The evidence is uncontroverted that tires are difficult to dispose of and create fire hazards to surrounding communities.See plaintiffs' Affidavit and Supplementary Affidavit; Debi Kimball, Recycling in America 63 (1992). Some companies shred tires to use them for fuel due to the high petroleum content in tires. Id. As Mr. Morin's affidavits are uncontroverted, the Court also acknowledges that a tire has the potential of releasing approximately one quart of oil into the environment if a fire occurred at the Davis site. Simple mathematics dictates that if six million tires caught on fire, approximately 1,500,000 gallons of oil will be released into the air, land, and water. This Court takes judicial notice of the composition and hazards of a tire on fire. R.I. Rules of Evid. 201.
If defendants are unable to comply with the removal efforts, subsection 7 of the December 7th Order entered allows DEM to carry out the Site Stabilization Plan or to contact for the removal in accordance with the Plan, as its finds allow. The funds to continue with the tire removal contact have been exhausted as defendants are unable to pay the contract amount and the Vehicle Tire Tax Restricted Receipt has been repealed with no available funds to subsidize the contract
The Court believes that the Davis site is unequivocally a health and environmental hazard with six million tires laying dormant waiting for disaster to strike. If the tire pile ignites by natural causes such as lightning or by arson, the State of Rhode Island will suffer the same health and environmental consequences that occurred both in the Westley and Ohio tire fires. The objective of the Site Stabilization Plan was to deter and decrease the magnitude of health and environmental consequences to the public, land, and water surrounding the Davis site as a result of a fire. The only method guaranteed to eliminate the health and environmental hazards is total tire removal from the Davis site.
The Court determines that there are no disputed facts in this matter, but only the question of statutory interpretation. This Court finds that a dispute exists concerning the legal rights and duties of the parties under the December 7th Order. In an effort to comply with the dictates of the December 7th Order, this Court believes that an actual controversy exists between the parties as to who is responsible for the continuation of the Site Stabilization Plan and where payment for its continuation is available or can be obtained. The burning of tires generates, inter alia, oil, petroleum, and petroleum by-products which when released into the environment poses a real and substantial threat to the public health and welfare, to the environment, and to the economy of the State.
Although the intervenors argue that the legislative intent behind the OSPAR. Fund is solely for oil spins, the Court finds that its interpretation is misplaced. Even if the OSPAR. Fund was created in response to the 1996 oil spill and just because the legislators did not specifically discuss that the OSPAR Fund should include and address products manufactured with oil, petroleum, and petroleum by-products during the floor debates, the foregoing are not automatically excluded from the OSPAR Fund. Furthermore, the OSPAR Fund does not allow recovery for all releases of oil, petroleum, or petroleum by-products into the environment, however tenuously, as argued by the intervenors. The legislators did not limit recovery to the oil spills from tankers on the Rhode Island sound, but included a broader picture as evidenced in the language of the statute. See § 46-12.7-1; § 46-12.7-51; and § 46-12.7-81 (1) and (2)(b). The foregoing makes great sense. The OSPAR Fund has specific safeguards and elements that must be met prior to any expenditure of money from the Fund. Even taking the intervenors argument as true, that recovery under the OSPAR Fund is confined to oil spills in Rhode Island sound, a fire at the Davis site would result in the dissemination of oil, petroleum, and petroleum by-products into the water, the amount of which would be classified as an oil spill into the waters of our beloved State. The threat of the release of oil, petroleum, and petroleum by-products in this case is real and actual without the Court having to connect some obscure dots to obtain a tenuous result. Even the intervenors admit in its memorandum that the OSPAR Fund is to be utilized for threatened oil spills.
Giving the wording of the statute its plain and ordinary meaning and considering the statute in its entirety, the OSPAR Fund covers the waterfront and is to be liberally construed. It seems short sighted to this Court for the intervenors, whose products go into the making of tires, to now complain about the use of the OSPAR Fund to prevent a health and environmental disaster. The language of the OSPAR Fund allows funding for preventative and threatened releases of oil or hazardous substances into the environment. For this Court to find otherwise would produce a ludicrous result as the OSPAR Fund would only be available after disaster struck. This would totally ignore the fact that preventative measures would produce less damage to human health and the environment, and is less costly than cleanup measures. More importantly, the Court notes that the title to the statute in dispute contains two operative words: prevention and response. Accordingly, this Court finds that the expenditure of money from the OSPAR. Fund in this matter is consistent with the statutory purposes of § 46-12.7-1, et seq.
Counsel shall submit an appropriate order for entry.