DECISION
Before the Court are the consolidated motions of the plaintiffs, Champlain's Realty Associates, L.P. ("Champlain's") and Island Hi-Speed Ferry, LLC. ("IHSF") (collectively "plaintiffs"), for injunctive and declaratory relief. Champlain seeks to enjoin the Town of New Shoreham ("Town" or "New Shoreham") and its Zoning Board of Review ("Board") (collectively "defendants") from enforcing a Cease and Desist Order issued by the New Shoreham Building Official prohibiting the docking of the vessel Montauk, operated by plaintiff Viking Quest, Inc., at Champlain's Marina located at New Harbor in the tidal waters off New Shoreham. Champlain also seeks to enjoin defendants from exerting zoning jurisdiction over or taking any adverse action against Champlain Marina relative to the Montauk Ferry's use of the marina below the mean high-water mark. Champlain's further seeks declaratory judgment declaring that Coastal Resource Management Council ("CRMC") has exclusive jurisdiction to regulate Champlain's operation of a docking facility for the Montauk. IHSF (on behalf of Payne's Wharf) and CRMC have intervened as plaintiffs in the instant matter. The CRMC has also been joined as a defendant. Jurisdiction is pursuant to G.L. § 42-35-15 and § 9-30-1
et seq.
 Facts/Travel
The current matter arises out of actions taken by the New Shoreham Town Building Official in response to docking activities at Champlain's Wharf and Payne's Wharf in the tidal waters off New Shoreham. Champlain's Wharf and Payne's Wharf were to be docking points for the loading and unloading of passengers visiting Block Island. The Montauk was slated to dock at Champlain's, and the Island Hi-Speed Ferry vessel was to dock at Payne's Wharf. In September 2000, the Building Official received a complaint relating to the Montauk Ferry's use of Champlain's Marina. The Building Official advised Champlain's that the zoning district in which Champlain's Wharf was located did not permit ferry terminals and that the Board was under the assumption that it had jurisdiction over the matter. On October 18, 2000, the Building Official issued to Champlain a Cease and Desist Order prohibiting the Montauk from docking at Champlain's Wharf.
Similarly, in October, IHSF began providing ferry service to Payne's Dock from the Port of Galilee. IHSF is a public utility, and holds a Certificate of Public Convenience and Necessity allowing it to provide public water carrier service from Galilee to Payne's Dock located in New Harbor, Block Island, Rhode Island. On February 26, 2001, the Building Official also issued to Payne's Wharf a Cease and Desist Order informing them that they were in violation of the Zoning Ordinance of the Town of New Shoreham by permitting IHSF to dock at their wharf. The notice of violation stated:
 "You are in violation of the following sections of the Zoning Ordinance of the Town of New Shoreham, Article 3: Section 306, Residential A Zone, (d) Permitted Uses and (e) Uses allowed with Special Use Permit; Section 312, New Harbor Commercial Zone, (d) Permitted Uses and (e) Uses allowed by Special Use Permit; Section 315 Flood Control Overlay, (c) Permitted Uses and (d) Uses allowed by Special Use Permit; Section 318, Waterfront Overlay (c) Permitted Uses, (3) and (d) Uses allowed by special Use Permit, (3); as your property, and Payne's New Harbor Dock, is being used as a terminal facility for the passenger carrying vessel known as the Island Hi-Speed Ferry.
Terminal Facilities for passenger and freight carrying vessels are not a permitted use in any of the applicable zones."
The Cease and Desist Orders issued to both Champlain's Wharf and Payne's Wharf referenced similar violations of the New Shoreham Zoning Ordinance. Under CRMC's regulations, Champlain's Marina and Payne's Wharf each are located in a Type 3 water area. A Type 3 water area under CRMC's regulations allows for high intensity boating uses and shoreline activities such as ferry terminals, marinas, boatyards and other water dependent associated business. However, the Town's Zoning Ordinance permits ferry terminals only in Type 5 area waters and requires a special permit for such use. According to CRMC guidelines, these uses of Type 3 waters are permitted so long as they do not significantly interfere with recreational boating activities.
In response to the Cease and Desist Order, Champlain's, on October 27, 2000, filed an appeal to the Board of the Notice of Violation and Cease and Desist Order issued on October 18, 2000.
Champlain's zoning appeal was originally scheduled to be heard on November 27, 2000, but has been continued on several occasions since that date. Prior to the zoning appeal hearing, Champlains sought a temporary restraining order and preliminary injunction so as to prohibit (1) the enforcement of the Town's Cease and Desist Order; (2) "any hearing, including but not limited to, a hearing before the New Shoreham Zoning Board of Review relative to the cease and desist order" and (3) the Building Official or the Zoning Board "otherwise exercising jurisdiction over or taking any adverse regulatory or enforcement action toward Champlain's relative to their use of the marina and docking complex including the landing of the Montauk Ferry at Champlain's and any other use of Champlain's Wharf below the mean high-water mark." On January 22, 2001, a Temporary Restraining Order ("TRO") was granted restraining the Board from hearing the matter.
On February 28, 2001, IHSF filed a motion to intervene in the current action on the grounds that the outcome of the current dispute between Champlain's and New Shoreham would affect IHSF's interests in conducting a ferry service from Galilee to New Shoreham. IHSF is in the same situation as Champlain's. In fact, procedurally, IHSF filed an appeal with the Board regarding the Cease and Desist Order directed to it and is currently seeking a Temporary Restraining Order of that proceeding, as did Champlain's.
The plaintiffs argue that CRMC has exclusive jurisdiction over their docking activities, because the docking facilities are situated below the mean high-water mark. Thus, they argue, the Building Official and New Shoreham are unable to restrict the docking of either the Montauk or the IHSF at Champlain's Wharf and Payne's Wharf respectively.
 Exhaustion of Administrative Remedies
In administrative law, it is well-settled that judicial review is only available after all administrative remedies have been exhausted. While § 42-35-15(a) of the Administrative Procedures Act states the general rule, it also states "Any preliminary, procedural, or intermediate agency act or ruling is immediately reviewable in any case in which review of the final agency decision would not provide an adequate remedy." Thus, when an inadequate remedy would result from requiring a party to exhaust all available administrative remedies, judicial review is immediately available. R.I. Chamber of Commerce v. Hackett, 411 A.2d 300, 302 (R.I. 1980). In Taylor v. Marshall, 376 A.2d 712, 119 R.I. 171 (1977), the court found that the zoning board had attempted to exercise jurisdiction which was in excess of its statutory and regulatory power. Therefore, the court found it was not necessary for plaintiffs to exhaust their administrative remedies before bringing their action since such a proceeding would have been futile. Similarly, in the instant action, plaintiffs propound that the Board lacks jurisdiction over their activities below the mean high-water mark. To require plaintiffs to exhaust administrative remedies through the New Shoreham Zoning Board of Appeal would be futile and would not provide an adequate remedy.
Moreover, even if it were possible for plaintiffs to obtain relief by administrative means, the Uniform Declaratory Judgments Act, § 9-30-1
et seq., grants the Superior Court "power to declare rights, status, and other legal relations whether or not relief is or could be claimed." Section § 9-30-12 provides that the Uniform Declaratory Judgments Act should be "liberally construed and administered."
As persons who are affected by an ordinance, plaintiffs are entitled to bring a declaratory judgment suit despite the possibility that administrative remedies might be available. (See Super R. Civ. P. 57, which states "the existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate.") The plaintiffs in the instant matter, in addition to injunctive relief, seek a declaratory judgment determining the jurisdiction of the Board over tidal waters below the mean high-water mark. This Court finds plaintiffs request for such relief to be appropriate under the Uniform Declaratory Judgments Act.
 Public Trust Doctrine
New Shoreham argues that by Chapter 617 of the Public Laws of 1887, the State, through an express legislative grant, ceded all right, title, and ownership of the Great Salt Pond ("New Harbor" or "Great Salt Pond") to the Town. As a result, New Shoreham contends that under Greater Providence Chamber of Commerce v. State, 657 A.2d 1038 (R.I. 1995), such a grant extinguishes the public-trust doctrine. As a result, the Town believes that New Harbor is exclusively within the control of New Shoreham and the Town is thereby free to exercise its zoning powers over its own property, which consists of the Great Salt Pond, its waters and underlying land on which Champlain's has its marina.
Chapter 617 of the Public Laws of 1887 states in pertinent part:
 "Section 1. All the right, title and interest of the state in and to the Great Salt Pond and the land covered thereby, in the town of New Shoreham, is hereby granted and ceded to said town of New Shoreham with the limitations hereinafter set forth:
 Section 2. Said town is hereby authorized and empowered to cause the breach formerly existing between said Great Salt Pond and the sea, or some other way or passage for the inflowing of water from the sea into said pond to be opened between said pond and the sea, and to keep and maintain such opening so made.
 * * *
 Section 4. If the said town shall neglect or refuse to exercise the power granted to it by section 2 of this act, or shall after causing said breach to be opened permit the same to become and remain closed for a continuous period of one year, the grant and cession by the state to said town herein contained shall then immediately be annulled."
The public-trust doctrine holds that the State holds title to all land below the high-water mark in a proprietary capacity for the benefit of the public. In benefiting the public, the doctrine preserves the public rights of fishery, commerce, and navigation in these waters. See Greater Providence Chamber of Commerce v. State, 657 A.2d 1038 (R.I. 1995). However, the public- trust doctrine can be extinguished by a valid legislative state grant. Id. The defendants believe that the above-mentioned grant extinguishes the states public-trust rights in the Great Salt Pond, in New Shoreham. The defendant maintains that the holdings in Greater Providence and Providence and Worcester Railroad v. Pine, 729 A.2d 202 (R.I. 1999), support their argument that the public-trust doctrine can be extinguished with regard to tidal lands. The court in Greater Providence Chamber of Commerce stated:
 "A littoral owner who fills along his or her shore line, whether to a harbor line or otherwise, with the acquiescence or the express or implied approval of the state and improves upon the land in justifiable reliance on the approval, would be able to establish title to that land that is free and clear. The littoral owner may pursue a course of action seeking to convey the deed to that property to himself or herself and become owner in fee-simple absolute provided that the littoral owner has not created any interference with the public-trust rights of fishery, commerce, and navigation. Once the littoral owner acquires title to the land in this manner, the state cannot reacquire it on the strength of the public-trust doctrine alone." (Emphasis added.) Greater Providence Chamber of Commerce v. State, 657 A.2d 1038, 1044 (R.I. 1995).
The predominant factor with regard to ownership of the tidal land in both Greater Providence Chamber of Commerce and Providence and Worcester Railroad was that the land had been filled by the littoral owners thus extinguishing the public-trust doctrine. "[F]illing of land to a harbor line
 `extinguished' the public-trust doctrine." Greater Providence Chamber of Commerce v. State, 657 A.2d 1038, 1044 (R.I. 1995), (quoting Allen v. Allen, 19 R.I. 114, 32 A.2d 166 (1895)). In contrast, the defendants in the instant matter have not filled tidal lands or even attempted to fill tidal lands in reliance upon an express or implied grant by the state. Thus, the above-mentioned cases are distinguishable from the instant matter. Here, the defendants rely on a one hundred and fourteen year-old legislative grant aimed at the maintenance of a breach way as an attempt to extinguish the public-trust doctrine.
According to plaintiffs, the goal of the 1887 conveyance was to promote the use of the Great Salt Pond by maintaining the breach which connected the Great Salt Pond to the ocean. The aim of the state in making the above grant, according to the plaintiffs, was to increase the publics rights in fisheries, commerce and navigation, not to impair such a right, as the Town's Building Official is attempting to do in the instant matter. Therefore, plaintiffs aver that the state did not expressly grant all rights in the Great Salt Pond to New Shoreham. Notwithstanding plaintiffs' protestations, the above grant, for all intents and purposes, conveys to the Town the area known as the Great Salt Pond so long as the Town maintains the breach. Whether such a grant dismantles CRMC's ability to regulate coastal activities in the Great Salt Pond is the issue before this Court.
According to plaintiffs, such a conveyance of tidal lands by the state does not emasculate the states power to provide that the tidal land be open to the public for fisheries, commerce and navigation.
The plaintiffs state that Illinois Central RR Co. v. Illinois,146 U.S. 387 (1892), permits the state to retain regulation over conveyed properties so as to maintain the publics' right to use those tidal lands for public purposes, which includes navigation and commerce. Our Supreme Court has held that land owned in fee by the state and subject to the public-trust doctrine may be conveyed by the state to a private individual by way of legislative grant, provided the effect of the transfer is not inconsistent with the precepts of the public-trust doctrine. Hall v. Nascimento, 594 A.2d 874 (R.I. 1991).
However, according to Rhode Island case law once the public-trust doctrine has been extinguished by an express conveyance by the state, the reach of the state and its agencies becomes limited. See generally, Greater Providence Chamber of Commerce v. State, Supra; Providence 
Worcester Railroad Co. v. Pine, Supra; Hall v. Nascimento, Supra. This Court is not convinced, however, that CRMC loses all ability to regulate tidal lands that have been conveyed by the state to a town or private individual.
Over the years, CRMC has participated in regulatory functions with regard to activities in New Harbor. In fact, New Shoreham, in its Great Salt Pond Management Plan, approved the CRMC's authority to classify the Town's waters in the Coastal Resource Management Plan administered by CRMC. The record indicates that CRMC has maintained involvement in the management of New Harbor despite New Shoreham's claim of exclusivity over New Harbor. Our state as well as other jurisdictions have long recognized the public-trust doctrine. However, another well recognized doctrine just as "ancient" and "vital" is the common law right of property owners to wharf out. Town of Warren v. Whitehouse, 740 A.2d 1255, 1259 (R.I. 1999). As stated in Whitehouse, each of these doctrines limits the authority of municipalities to regulate tidal lands. The court in Whitehouse explicitly found that because the legislature did not grant local authorities the power to regulate a riparian owner's right to wharf out such power remained with the state and its agencies. "A riparian landowner has the right to construct whatever wharf or dock is necessary to gain access to navigable waters, as long as such construction does not interfere with navigation or the rights of other riparian land owners." 740 A.2d at 1260.
The plaintiffs contend that even if the transfer of a fee interest in the Great Salt Pond to New Shoreham was assumed to extinguish the public-trust doctrine, CRMC still maintains exclusive authority to regulate the Great Salt Pond because of the constitutionally protected right of riparian property owners to wharf out. Because the legislature has not explicitly granted to municipalities the authority to limit this traditional common-law right to wharf out, the CRMC is vested with exclusive jurisdiction to regulate the use of those wharves in tidal waters. This Court agrees.
In the instant matter, the public-trust doctrine with regard to New Harbor is not extinguished under the purported grant by the state. Furthermore, the riparian right to wharf out preserves CRMC's jurisdiction over wharves and the activities associated with same.
 CRMC's Jurisdiction
Having concluded that the public-trust doctrine was not extinguished, this Court now turns to the issue of whether CRMC has jurisdiction over the commercial use of Champlain's Marina and Payne's Wharf each of which are located in tidal areas below the mean high-water mark in New Harbor. The dispositive issue in the instant matter is whether CRMC has exclusive jurisdiction over the water-related activities of Champlain's Wharf and Payne's Wharf below the mean high-water mark or whether the Town of New Shoreham is the exclusive regulatory body of the activities below the mean high-water mark. Plaintiffs contend that Town of Warren v. Thornton-Whitehouse, 740 A.2d 1255 (R.I. 1999), is dispositive of that issue. Plaintiffs aver that our Supreme Court determined in Whitehouse that CRMC has exclusive jurisdiction of tidal areas beginning at the mean high-water mark.
Therefore, plaintiffs believe that their activities are regulated by CRMC, not the Town of New Shoreham Zoning Board.
In order to determine the purpose of the CRMC and its jurisdiction, it is important to trace the statutory origins of CRMC. In 1971, the Rhode Island Coastal Resource Management Council was created. The CRMC was created to serve "as the principal mechanism for management of the state's coastal resources." G.L. § 46-23-1(c). The agency was bestowed with the "primary responsibility" of "planning for and management of the resources of the state's coastal region." G.L. 1956 § 46-23-6.
The legislature, in recognizing that the "coastal resources of Rhode Island . . . are of immediate and potential value to the present and future development of this state," instituted a policy in order:
 "to preserve, protect, develop, and where possible, restore the coastal resources of the state for this and succeeding generations through comprehensive and coordinated management designed to produce the maximum benefit for society from these coastal resources . . ." G.L. § 46-23-1(a).
This grant of authority to CRMC has been deemed to be in accordance with the Rhode Island Constitution. See Milardo v. Coastal Resources Management Council, 434 A.2d 266, 272 (R.I. 1981). The CRMC posses jurisdiction over both land and water areas. Ratcliffe v. Coastal Resources Management Counsel, 584 A.2d 1107, 1110 (R.I. 1991). Although CRMC's authority over land areas is limited, its authority over developments or operations within the tidal water is quite broad. This broad authority is illustrated by the language of G.L. § 46-23-6(2), which empowers CRMC "to approve, modify set conditions for, or reject . . . proposal[s] " for development[s] or operation[s] within, above, or beneath the tidal water below the mean high- water mark . . . ." Specifically, § 46-23-6(2)(ii)(A) provides:
 "Any person, firm, or governmental agency proposing any development or any operation within, above or beneath the tidal water below the high water mark, extending out to the extent of the state's jurisdiction in the territorial sea shall demonstrate that its proposal would not:
 (I) Conflict with any resources management plan or program adopted by the council;
 (II) Make any area unsuitable for any uses or activities to which it is allocated by a resources management plan or program adopted by the council; or (III) Significantly damage the environment of the coastal region. (B) The Council shall be authorized to approve, modify set conditions for, or reject any such proposal."
Pursuant to its enabling legislation, CRMC is vested with a panoply of powers and duties. The CRMC has the power to "issue, modify or deny permits for any work in, above, or beneath the areas under its jurisdiction, including conduct of any form of aqua culture," and the power to "grant licenses, permits and easements for the use of coastal resources which are held in trust by the state for all its citizens . . .," See G.L. § 46-23-6(2)(i), 46-23-6(4)(i), 46-23-6(4)(iii). Furthermore, if there has been a violation of the CRMC's program or its regulations, CRMC is empowered to issue cease and desist orders. See G.L. § 46-23-7.
It is clear from the enabling legislation that CRMC is endowed with a litany of regulatory powers relative to Rhode Island's coastal resources. The extent of that power and the reach of CRMC's regulatory grasp is the salient issue before this Court. This Court believes that Town of Warren v. Thornton-Whitehouse is dispositive of that question. In Whitehouse, a resident of Warren, R.I., proposed to construct a residential dock for use in conjunction with his personal residence. The Court held that CRMC had exclusive jurisdiction over residential wharves in tidal waters beginning at the mean high-water mark.
However, the Court issued a caveat, stating that the holding "in no way limits or restricts the traditional zoning power of municipalities." "The CRMC must still defer to local zoning regulation for all projects that extend above the mean high-water mark into the uplands." The Court in Whitehouse, cited to an example which related to the use of a dock for commercial ferry operation. The Court stated "[I]f CMRC approves a wharf for a commercial ferry operation, the municipality can still exercise its zoning power to regulate construction of buildings, landscaping, lighting, and any other use of the upland." See Town of Warren v. Whitehouse, 740 A.2d 1255, 1260 (R.I. 1999).
The defendants contend that Whitehouse distinguishes between commercial and residential wharves and maintain that under Whitehouse the town zoning board retains jurisdiction over commercial wharves. This Court finds that as to the matters here at issue there is no discernible distinction to be drawn between commercial wharves and residential wharves. CRMC jurisdiction extends to those activities below the mean high-water mark regardless of whether the dock is used for commercial or residential purposes.
It is uncontroverted that the subject properties are located in tidal waters and extend seaward beyond the mean high-water mark. Thus, according to Whitehouse, the location of the wharves below the mean high-water mark ostensibly make them subject to CMRC regulation. However, as defendants point out, the court in Whitehouse made it clear that a zoning board could still exercise its regulatory power over floating docks and wharves, depending on the use to which those docks are put. For example, the court stated if a dock was used for a commercial business such as a bait shop, in which it sold bait to boaters, the town zoning board could enjoin such activity if the land appurtenant to the dock is zoned for residential use. The defendants interpret that to mean that if the use of a dock or wharf is inimical to the appurtenant land it may regulate the dock or wharf itself.
Although a zoning board may retain certain regulatory powers over a commercial wharf or dock, this Court finds that such zoning power is inapplicable in the instant matter. It is clear from the enabling legislation that CRMC is vested with the absolute authority to regulate "development or operation within, above, or beneath the tidal water below the mean high-water mark." G.L. § 46-23-6(2).
The parties in this case are simply docking their vessels at their respective wharves. Here, the mean high-water mark serves as a clear demarcation between the Board's power and that of the CRMC. The court in Whitehouse acknowledged that CRMC has the ability to approve a wharf for commercial ferry operation. The Court stated "[I]f CRMC approves a wharf for a commercial ferry operation the municipality can still exercise its zoning power to regulate . . . use of the upland." (Emphasis added.) Although the operation of a ferry may be commercial, it is not the type of commercial activity that warrants concurrent regulation by the town zoning board as intimated by Whitehouse.[1] See E. Sands Payne v. Town of New Shoreham, CA W.C. 96-267, May 15, 1998, (Thunberg, J.) (zoning board had jurisdiction over Kayak seller's trailer and sign, but not the launching of kayaks into Type II waters). This Court acknowledges New Shoreham's right to regulate those areas above the high-water mark, such as parking facilities, lighting and other associated uses.
However, those areas below the mean high-water mark are within the exclusive jurisdiction of CRMC.
A review of the enabling legislation and the broad powers granted to CRMC leads to the inevitable conclusion that permitting or prohibiting of the docking of vessels below the mean high-water mark along coastal regions is exclusively within the jurisdiction of CRMC. In fact, CRMC's regulatory plan provides for the regulation of commercial ferries in designated areas throughout Rhode Island waters. The landing of commercial vessels, including passenger ferries, is an appropriate use of Type 3 water in which Champlain's docks are located, according to CRMC, as long as the use does not significantly interfere or preclude recreational boating.
According to CRMC's definition, a Type 3 water includes "intensely utilized water areas where recreational boating activities dominate and where the adjacent shorelines are developed as marinas, boatyards, and associated water-enhanced and water-dependent businesses." 200.3 Definition.
According to plaintiffs, the executive director of CRMC testified at the hearings before the Division of Public Utilities and Carriers that "high intensity boating as defined in the CRMC plan includes activities at marinas and associated water-enhanced and water-dependent business, and that Payne's dock was such a facility."[2] (IHSF brief at 5-6). According to CRMC Findings, "marinas are the principal means by which the boating public gains access to tidal waters, and therefore provide important public service. Only beach going involves more Rhode Islanders in a recreation activity that makes direct use of tidal waters." 200.3 (1) Findings. In fact, under CRMC 200.3 (1) Policies, "the council's goal is to preserve, protect, and, where possible enhance Type III areas for high-intensity boating and the services that support this activity." The council also "encourages marinas to seek innovative solutions to increased demands for moorings, dockage, and storage space, and allows marina operators to alter the layout of their facilities and increase their capacity . . . without applying for a new Assent."
A major portion of the Whitehouse decision, other than the determination of jurisdiction below the mean high-water mark, was devoted to the issues of preemption and continuity. The court was aware of the fact that a state-created agency potentially preempted the ordinances of a zoning board, where the agency occupied the field, or its rules or laws were in conflict with local zoning ordinances.
See Town of East Greenwich v. Narragansett Electric, 651 A.2d 725, 729 (R.I. 1994). (Public Utilities Commission completely occupied the field of utilities regulation.) Whitehouse specifically stated that municipalities may not enact zoning ordinances aimed at the regulation of tidal land.
The Zoning Ordinances which plaintiffs are accused of violating are incongruous regarding that principle. By the very issuance of the Cease and Desist Order, the Town is asserting that the plaintiffs' activities occurring in tidal lands below the mean high-water mark are in violation of municipal ordinances. As such these ordinances are in conflict with CRMC's extensive regulations pertaining to docks, wharves, and navigable waters. Although it is not intended for CRMC to exclusively regulate all aspects of shoreline activities, those activities below the high water mark are under CRMC's control.
See E. Sands Payne v. New Shoreham CA W.C. 96-267, May 15, 1998, (Thunberg, J.) (town could regulate trailer and business sign but not launching of kayaks into Type II water which was under CRMC's jurisdiction.) Therefore, insofar as the New Shoreham ordinances purport to regulate tidal waters, they are a nullity. Furthermore, it is uncertain that the ordinances, as enacted, even apply. As plaintiffs point out, New Shoreham Zoning Ordinances section 306 Residential A Zone and section 312 New Harbor Commercial Zone regulate only the use of land areas on the Town's zoning map.
Moreover, section 315 Flood Control Overlay and section 318 Waterfront Overlay contain language that the ordinances regulate land ward of the mean high-water mark.
The court in Whitehouse warned that concurrent jurisdiction between the zoning board and CRMC would be antithetical to the social and economic well being of Rhode Island coastal resources.
The court cautioned:
 "if municipalities possessed concurrent jurisdiction over residential boat wharves, each one would be able to impose varying standards for the place, construction, and appearance of those wharves. Some cities or towns acting out of parochial interest might make it more difficult to get approval to construct docks, thereby resulting in unreasonable concentrations of docks in some places and too few docks in others." Whitehouse, 740 A.2d at 1262.
Similarly, in the instant matter, if New Shoreham were to regulate docking facilities, it may result in the over concentration of vessels in certain coastal areas, which would completely undermine the goal of CRMC to preserve the Rhode Island coast line. CRMC has a comprehensive plan designed to determine the effects of various activities upon the Rhode Island coast line. It is CRMC which the legislature has deemed to be best equipped to handle the conditions that arise with regard to tidal waters and those areas below the mean high-water mark.
Having determined that CRMC has jurisdiction in the instant matter, this Court finds the issue of whether New Shoreham's activities interfered with interstate commerce is rendered moot.
Finally, an issue also has been raised as to whether the filing by plaintiffs of their separate appeals to the Board precludes this action, that is to say, defendants claim that plaintiffs by reason of their appeals to the New Soreham Zoning Board of Review are precluded from pursuing this action before this Court. Having found that the Zoning Ordinances as to the issues before this Court are without effect, this Court must answer that question in the negative.
 Conclusion
For the foregoing reasons, this Court declares that CRMC possesses jurisdiction below the mean high-water mark. Accordingly, the plaintiffs' request for injunctive and declaratory relief is granted.
Prevailing counsel shall submit an appropriate order for entry.
[1] For example, the court in Whitehouse stated if CRMC were to approve an application for construction of a floating restaurant, the town would continue to exercise its traditional authority over such items as liquor licenses or hours of operation.
[2] Under CRMC 300.4 Definitions A (1) Marina includes any dock, pier, wharf, float, floating business, or combination of such facilities that accommodate five or more recreational boats.